Louisquisset Golf Club, Inc. v. Commissioner.
Louisquisset Golf Club, Inc. v. Commissioner
Docket No. 84752.
United States Tax Court
T.C. Memo 1962-297; 1962 Tax Ct. Memo LEXIS 10; 21 T.C.M. (CCH) 1577; T.C.M. (RIA) 62297; December 19, 1962
*10 On May 15, 1930, petitioner exchanged 100 of its "mortgage bonds" for and in proportion to the ownership of all its outstanding capital stock. It also issued two additional bonds to two architects in payment of services they had rendered. One hundred thirty-three shares of common stock of par value of $5 each were issued to the bondholders in proportion to the ownership in the 100 bonds previously issued to them. The $102,000 principal was to mature May 15, 1950, and interest at eight percent per annum was payable semiannually. Interest was paid and claimed as a deduction until the maturity date. On May 15, 1950, petitioner exchanged its debenture bonds for and in proportion to the ownership of the mortgage bonds. Interest was paid annually and claimed as a deduction for each of the ensuing years through the taxable year 1958. Respondent denied the deductions for the three taxable years 1956, 1957 and 1958. Held: Petitioner has failed to establish that the debenture bonds represent a debtorcreditor relationship rather than a capital investment and the respondent's determination is sustained. James M. Langan, Esq., Alan F. Cusick, 702 Industrial Bank Bldg., Providence, R.I., and Daniel *11 J. Dempsey, Esq., for the petitioner. J. Frost Walker, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined income tax deficiencies against the petitioner for the years 1956, 1957 and 1958, in the respective amounts of $2,448, $2,448 and $2,339.64. The only question presented is whether the payments on debenture bonds were interest on indebtedness or dividends on stock. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioner, a Rhode Island corporation, incorporated on November 23, 1927, operates a public golf course at or near Providence, Rhode Island. It filed its income tax return for each of the taxable years ended December 31, 1956, 1957 and 1958, with the director of internal revenue for the district of Rhode Island. Petitioner kept its books and filed its returns on an accrual accounting basis. For several years prior and subsequent to the incorporation of the petitioner, William W. Reynolds and Joseph A. Peterson engaged in business as a partnership under the name of Warren Landscape Engineering Company. From 1928 through 1948 Peterson was president of petitioner *12 and during the same period through 1958 Reynolds was treasurer. During the years 1928 through 1958 petitioner's books were in the care of Reynolds. In 1928 and 1929 Reynolds and Peterson contributed property, services and cash to petitioner in exchange for petitioner's capital stock in proportion to the value of such property, services and cash. At the first meeting of petitioner's stockholders held on January 24, 1928, a letter dated January 24, 1928, from Reynolds to petitioner, was read in which it was stated that Reynolds was willing to convey to the corporation certain property, more particularly described in a deed submitted with the letter, (but not of record herein) in consideration of the issuance to Reynolds of 204 shares of preferred stock and 132 shares of common stock, and to Reynolds' nominee, Joseph A. Peterson, 136 shares of preferred stock and 88 shares of common stock. The letter further recited that Reynolds and Peterson for the past six months had done work and rendered services incident to the ultimate formation of the corporation; that the services had included the expenditure of a great deal of time and labor and a considerable amount of money; that the services *13 also consisted of seeking possible sites for the location of a golf club, holding conferences with golf club architects and landowners and procuring the necessary physical property for the establishment of the golf club; that such services represented a fair charge against the corporation; and that if 240 and 160 shares of common stock were respectively issued to Reynolds and Peterson, the claim for services rendered would be paid in full. The minutes reflect that the terms of the letter were accepted and the issuance and delivery of the corporation's common and preferred stocks, in accordance with the offer, were authorized. The minutes further show that the stockholders voted that the remainder of the capital stock be held in the treasury subject to the order of the board of directors. Petitioner's first year of operation was 1928. On its income tax return for that year it reported it had no assets or liabilities at the beginning of the year. It reported gross sales of $10,616.80, merchandise bought for sale - $1,632.23, inventory - $23.84, and gross profit of $9,008.41. With two small items of other income and deductions for business expenses, a net income of $2,361.23 was reported. *14 Included in assets as of the end of the year, as shown on the return, were land - $34,070.50, buildings - $5,986.08, machinery and equipment - $944.01 and tractors - $300. With other small assets, the total assets amounted to $41,556.78. Liabilities reported consisted of notes payable in the amount of $5,195.55, capital stock - $34,000, and surplus or undivided profits of $2,361.23. Peterson, as president, was the only officer shown who received compensation, and that was in the amount of $218. The return showed he was the owner of 160 shares of common stock and 144 shares of preferred stock. [1] *15 Peterson signed the return as president of the corporation and Reynolds signed as treasurer. The minutes of petitioner reflect that on February 18, 1929, Reynolds wrote a letter to petitioner in which it was stated that Reynolds had paid into petitioner's treasury, some three months before, a loan for the use of the corporation in the amount of $5,000; that the sum was due and owing; but that Reynolds was willing to accept in liquidation of the indebtedness, 51 shares of preferred stock and 51 shares of common stock. The minutes show that the offer was accepted. They further show another letter dated February 18, 1929, had been written to the corporation by Reynolds and Peterson in which it was stated that the signers had furnished the corporation cash and materials in the amount of $32,000 for the development and conduct of the golf course; that receipted vouchers were available; and that they were willing to liquidate the claim in full upon the issuance of capital stock as follows: To Reynolds, 192 shares of preferred stock and 200 shares of common stock; to Peterson, 128 shares of preferred stock and 120 shares of common stock. There was a further recital that Reynolds was to receive 8 more shares of common than preferred stock and Peterson 8 shares *16 less of common than preferred stock in order to correct an error made on January 25, 1928, when 196 shares of common stock were issued to Reynolds instead of the proper number of 204 shares and 144 shares were issued to Peterson instead of the proper number of 136 shares. [2]
The minutes show that the offer was accepted and the proper officers were authorized and directed to issue and deliver the certificates of stock and that the receipted vouchers covering the claim be filed with the treasurer upon delivery of the stock. The minutes further recited that approximately one year's dividends had accrued on the outstanding preferred stock issued on January 25, 1928; that it was voted that the dividends be liquidated by the issuance of preferred stock, dollar for dollar, on the dividends accrued to January 25, 1929, the amount being $1,700 and that the total of 17 shares of preferred stock be issued. It was also voted that upon approval in writing of this method of liquidating the preferred dividends on the part of the preferred stockholders, *17 preferred stock be issued to them, fractional shares to be adjusted between them. [3]
The minutes of petitioner reflect that a special meeting of all stockholders, both preferred and common, was held on July 23, 1929, for the purpose of increasing the capital stock of the corporation and it was unanimously voted by all the stockholders of both classes that Article V of the Articles of Association of the corporation be amended to read as follows: Article No. FIFTH: The total amount of authorized capital stock of said corporation, with par value, shall be One Hundred Thousand Dollars ($100,000) as follows, viz: Preferred stock in the amount of One Hundred Thousand Dollars ($100,000) to be divided into one thousand (1,000) shares of the par value of One Hundred Dollars ( $100) each. The total number of shares of capital stock authorized, without par value, shall be One Thousand Two Hundred Sixty-Three (1,263) shares as follows, viz: - one thousand two hundred sixty-three (1,263) shares of common stock, without par value; The preferred stock shall be *18 entitled out of the net profits or surplus of the corporation as determined by the Board of Directors to quarterly cumulative preferential dividends up to and including the period ending December 31, 1929, at the rate of five (5%) per centum per annum and thereafter at the rate of seven (7%) per centum per annum and no more, payable quarterly on the first days of January, April, July and October of each year. The Board of Directors may pay dividends on the common stock out of the balance of the net profits or surplus as determined by said Board provided the dividends upon the preferred stock with all accumulations shall have been paid in full or a sum sufficient for the payment thereof shall have been set apart for that purpose, but not otherwise. In case of liquidation or dissolution, voluntary or otherwise, the preferred stock shall be paid in full at One Hundred ($100.00) Dollars per share and accumulated dividends, if any, before any payment is made upon the common stock and the remaining assets shall be distributed among the holders of the common stock. The corporation may redeem the entire amount of outstanding preferred stock on any dividend date upon giving ten (10) days' notice *19 and paying for the same One Hundred ($100.00) Dollars per share. Except as herein specificially provided holders of preferred stock shall have no voting power and holders of the common stock shall have sole voting power. If at any time, however, there shall be default in the payment of three (3) successive dividends as aforesaid and said default shall not be redeemed within thirty (30) days from the date that the third dividend should have been paid, the preferred stock shall thereupon be entitled to full voting power in the corporation share for share with the common stock outstanding. Said corporation shall have the right in case of sale of the common stock by any stockholder to purchase said stock at the lowest price at which said stockholder is willing to sell before the same shall be sold by such stockholder to any other person, provided, however, that said corporation must exercise the right, if at all, within ten (10) days after receiving from such stockholder notice in writing of the intention of such stockholder to sell and the lowest price at which he is willing to sell. No sale or transfer of the common stock of the corporation to any party other than the corporation shall *20 be valid nor shall any share of such stock be transferred on the books of the corporation to any party other than the corporation unless said stock shall have been first offered in writing to the corporation by the holder of record thereof for sale at a designated price. No sale or transfer of such stock of the corporation at a price lower than that at which the same shall have been offered in writing to the corporation shall be valid or give any person the right of transfer of the same on the books of the corporation. * * *
The board of directors was authorized to issue the additional stock and any stock theretofore authorized and not outstanding upon such terms and conditions as the board deemed for the best interests of the corporation. On petitioner's 1929 return, gross sales were shown as $29,786.56, cost of goods sold $3,564.07 and gross profit $26,222.49, which was increased to $26,316.40 by three other small items of income. Deductions were reported at the aggregate total of $22,423.57, showing a net income of $3,892.83. Included in the expense items was the amount of $11,100 paid to the officers - Reynolds as treasurer receiving $6,900, and Peterson as president, $4,200. Each *21 was respectively shown to be the owner of 665 and 376 shares of common stock and 507 and 271 shares of preferred stock. [4] As shown on the return, petitioner's assets, less depreciation of $823.90, totaled $86,589.30. They included cash, $1,170.70, accounts receivable, $8,861.85, and inventories, $4.20. Also, included and listed as capital assets were land, $34,070.50, buildings, $7,922.15, machinery and equipment, $3,083.80, tractors, $300, and golf course, $32,000. Liabilities in the aggregate amount of $86,589.30, consisted of accounts payable, $606.04, capital stock, $81,800, and surplus or undivided profits, $4,183.26. The return was signed by Peterson as president and Reynolds as treasurer. In the meantime Reynolds and his wife, Grace Gurney Reynolds, were having marital difficulty and on March 8, 1930, they entered into a separation agreement. On April 2, 1930, they were divorced under decree nisi which became a final decree on October 7, 1930. Under the separation agreement Reynolds was to set up a trust with which he was to deposit marketable securities to secure weekly payments to his wife for *22 her support and for the support of their three minor children, William D. Reynolds, age 15, Charles A. Reynolds, age 13, and Robert G. Reynolds, [5] *23 age 11. Under the agreement he was to deposit with the trustee marketable securities to an amount of $4,000; cash of $1,000; a second mortgage for $7,500 (on property then owned jointly by both); and a first mortgage for $12,500 (on property owned by Reynolds alone). It was further agreed, however, that Reynolds had full power of substitution and change of securities deposited with the trustee and of the full beneficial use of said securities as to income or otherwise, it being understood, however, that in the event of substitution or changes in said securities or in the event that the market value of any securities shall depreciate, he would deposit with the trustee other securities so that the market value of the securities held by the trustee would at all times be not less than $25,000. Pursuant to the terms of the separation agreement, on April 2, 1930, Reynolds entered into a trust agreement with the Industrial Trust Company, which was later succeeded by the Industrial National Bank of Providence. Under the provisions of the trust agreement, Reynolds deposited with the trustee cash of $1,000 and securities of a market value in excess of $24,000. Payments of the interest accruing on the securities were to be made to the trustee which was authorized to make payments to the wife should Reynolds be in default. If not in default, the trustee was to make the payments to Reynolds. What securities were turned over to the trustee are not shown. However, from the inception of the trust on April 2, 1930, until early in the year 1939, the trustee received no payments on the securities it held. It had no title to the securities and apparently Reynolds met his payments to his wife promptly and collected the payments on the securities himself. Commencing in 1939, the trustee received semiannual payments of eight percent on the securities until the trust was *24 terminated in 1958, which payments were immediately turned over to Reynolds. Petitioner's 1930 securities matured in 1950 and were exchanged in a like amount for new securities of petitioner, hereinafter described. New securities were substituted for the old securities held by the bank trustee which at that time were in the face value of $61,000. The trustee had insisted during some undetermined period of time that Reynolds replace the securities of petitioner or give additional securities with which the trustee would be assured of adequate collateral to enforce the terms of the trust agreement. At one time between 1940 and 1950 the only securities the trustee held were securities of petitioner although it then held some life insurance policies on the life of Reynolds with a face value of $45,000. In 1956 Reynolds withdrew the securities of petitioner from the trust and deposited in their place certain other securities. A special meeting of petitioner's stockholders was held on May 14, 1930, [6] "to *25 consider the question of issuing One Hundred Two Thousand ($102,000) Dollars, 20-year first mortgage registered 8% bonds in exchange for all the present outstanding preferred and common stock." After discussion, it was unanimously RESOLVED: That the proper officers, of Louisquisset Golf Club, Inc. be, and they hereby are, authorized, empowered and instructed to execute an indenture of mortgage and deed of trust of this company upon all the real and personal property, including all buildings, appliances, equipment and property used in connection with the company's business of conducting and promoting golf, tennis and other outdoor sports and all real property hereafter acquired by the company in form to be approved by the directors and counsel selected by them for the purpose of securing an issue of bonds of this company known as Louisquisset Golf Club, Inc. First Mortgage 8% Gold Bonds *26 in the amount of One Hundred Two Thousand ($102,000) Dollars of even date and priority without regard to the time of their respective sale and delivery or the individual issue to the respective holders thereof, payable on May 15th, 1950, with such numbers and in such denominations as may be prescribed by the board of directors and bearing interest at the rate of eight (8%) per centum per annum, payable semi-annually, until the whole principal and interest is paid, said bonds to be sold at not less than the par value thereof and the proceeds of the sale of said bonds to be used to retire all the present outstanding preferred and common stock of the company, and the officers of this company are hereby authorized and empowered to do all such things as may be necessary or advisable in connection with the issuance of said bonds and the execution, delivery and registration of such indenture of mortgage and deed of trust. * * *
The minutes of the meeting further reflect it was unanimously RESOLVED: That One Hundred Thirty-Three (133) shares of the unissued no par value common stock of the company be offered for subscription to the present stockholders of the company at $5.00 per share in the *27 following amounts: William W. Reynolds
81 shares
Joseph A. Peterson
48 shares
Daniel F. Harrington [7]
4 shares
133
And the proper officers of the company be, and the same hereby are, authorized and directed to issue and deliver said shares to said persons upon receipt of their subscription therefor at $5.00 cash per share. * * *
On May 15, 1930, petitioner, through its president, Joseph A. Peterson, and its treasurer, W. W. Reynolds, entered into an indenture, entitled "Trust Mortgage," with W. W. Reynolds, Inc. , a Rhode Island corporation, represented by its president, W. W. Reynolds, petitioner being called the "company" and party of the first part and W. W. Reynolds, Inc., being called "Trustee," and as trustee, party of the second part. The indenture set forth the resolution of petitioner's stockholders as shown above; a following resolution of the board of directors; the form of the "First Mortgage, 8% Gold Bonds" to be issued; and the form of the "Trustee's Certificate," to be used by the trustee in registering the holders of the bonds. In the resolution *28 adopted by the board of directors the treasurer was directed to deliver the bonds to the stockholders for their common and preferred stock and for other considerations, and to other persons upon certain terms, as follows: To William W. Reynolds 61 bonds upon receipt from him of 665 shares of common stock, 507 shares of preferred stock and his promissory note payable on demand for $780.12. To Joseph A. Peterson 35 bonds upon the receipt from him of 376 shares of common stock, 271 shares of preferred stock and his promissory note, payable on demand, for $294.24. To Daniel A. Harrington 4 bonds upon receipt from him of 40 shares of preferred stock, 40 shares of common stock and his promissory note, payable on demand, for $751.44. [8]
To Stiles and Van Kleek, architects, 2 bonds in full satisfaction of the company's indebtedness in the amount of $2,000 for professional services rendered the company. The indenture showed that in consideration of $1.00 duly paid by the trustee, the company *29 conveyed to the trustee, its successors and assigns, two tracts of land consisting of approximately 96 and 16 acres, respectively, located in the Town of North Providence and deescribed by metes and bounds, to secure equally the payment of the principal and interest of the bonds outstanding. The secretary of petitioner, Edward G. Fletcher, attested to the signatures of the president, Peterson, and the treasurer, Reynolds. Reynolds as treasurer of W. W. Reynolds, Inc., attested to the signature of the latter's president, Reynolds. The trust mortgage was received for record in North Providence by the town clerk on October 22, 1930. On May 15, 1930, petitioner issued 100 of the "First Mortgage 8% Gold Bonds," hereinafter referred to as gold bonds, each of a face value of $1,000, in exchange for and in proportion to the ownership of all its outstanding capital stock. On the same date, petitioner issued two of the gold bonds to the firm of Stiles and Van Kleek in payment of services rendered as architects. Simultaneously with such exchange of 100 gold bonds for all outstanding capital stock and the issuance of the two gold bonds to the architects, petitioner issued 133 shares of common *30 stock at a par value of $5 per share as follows: Number of
Person to
Shares Issued
Whom Issued
81
William W. Reynolds
48
Joseph A. Peterson
4
D. F. Harrington The issuance of the 133 shares of common stock was in proportion to the ownership of Reynolds, Peterson and Harrington in the 100 gold bonds previously issued to them. As shown on the return, comparative balance sheets of petitioner as January 1 and December 31, 1930, are as follows: Decem-
January 1,
ber 31,
ASSETS
1930
1930
Cash
$ 1,170.70
$ 7,096.36
Accounts Receivable
8,861.85
5,200.00
Inventories
4.20
19.69
Land
34,070.50
26,120.50
Buildings
7,922.15
8,422.15
Machinery Equipment
3,083.80
4,168.80
Tractors
300.00
300.00
Golf Course
32,000.00
62,006.70
$87,413.20
$113,334.20
Less: Reserves for depreciation
823.90
1,741.36
Total Assets
$86,589.30
$111,592.84
LIABILITIES
Accounts Payable
$ 606.04
$ 87.09
Gold Bonds
102,000.00
Accrued Interest
1,020.00
Common Stock
81,800.00
665.00
Undivided Profits
4,183.26
7,820.75
Total Liabilities
$86,589.30
$111,592.84 On the 1930 return petitioner reported that Reynolds, as treasurer, owned 81 shares of common stock and received compensation of $8,400, and that Peterson, as president, owned 48 shares of common stock and received compensation of $5,200. *31 On June 30, 1946, petitioner purchased Harrington's four shares of capital stock. From time to time, subsequent to May 15, 1930, and prior to May 18, 1950, Reynolds purchased from Peterson 33 gold bonds and 48 shares of capital stock, the architects' two gold bonds and Harrington's four gold bonds. On May 15, 1950, Reynolds owned all of petitioner's outstanding capital stock and 39 of the 102 gold bonds. The Industrial National Bank, trustee of the Reynold's trust, described above, held 61 of the 102 golds bonds deposited with it by Reynolds and two of Reynold's sons owned the other two gold bonds, having purchased them from Peterson prior to May 15, 1950. On May 15, 1950, the 102 gold bonds were surrendered by the owners to petitioner in exchange for 102 new securities called "8% Debenture Bonds," hereinafter referred to as debenture bonds. At the same time W. W. Reynolds, Inc., executed a "Discharge of Mortgage Indenture," the mortgage indenture hereinabove referred to and described. As shown on the return, comparative balance sheets of petitioner as of January 1 and December 31, 1950, are as follows: Decem-
January 1,
ber 31,
ASSETS
1950
1950
Cash
$ 1,105.55
$ 3,291.93
Notes and Accounts Re-
ceivable
7,000.00
6,540.85
Stocks and Bonds - Do-
mestic
12,584.00
8,734.00
Buildings
15,831.85
15,831.85
Machinery & Equipment
13,698.67
15,234.77
Trucks and Tractors
2,492.85
5,377.15
Land
29,288.50
29,288.50
Treasury Stock
550.00
550.00
Golf Course
62,006.70
62,006.70
Insurance Prepaid
691.08
492.79
$145,249.20
$147,348.54
Less: Reserve for De-
preciation
19,106.06
20,833.62
Total Assets
$126,143.14
$126,514.92
LIABILITIES
Accounts Payable
$ 713.69
$ 172.02
Bonds
102,000.00
102,000.00
Accrued Taxes
728.52
2,473.61
Accrued Interest
1,020.00
1,020.00
Accrued Wages
130.00
110.00
Accrued Federal Income
Taxes
245.14
601.39
Reserve for Obsolescence
of Golf Course
14,671.06
14,671.06
Common Stock
665.00
665.00
Undivided Profits
5,969.73
4,801.84
Total Liabilities
$126,143.14
$126,514.92
On *32 December 31, 1956, after several gifts to members of his family, the 102 debenture bonds were held by Reynolds and his sons and daughters in amounts as follows: Name
Amount
William W. Reynolds
$ 22,000
Charles A. Reynolds
7,000
William D. Reynolds
7,000
Robert G. Reynolds
6,000
Polly Reynolds
$ 12,000
Nancy Reynolds
12,000
Lynn Reynolds
12,000
Jeffrey Reynolds
12,000
William W. Reynolds, II
12,000
Total
$102,000
From 1930 and including May 15, 1950, petitioner made payments of eight percent of the face amount of the 102 gold bonds and claimed such payments as interest deductions on its income tax returns. From May 15, 1950, to and including the taxable years 1956, 1957 and 1958, petitioner made payments of eight percent of the face amount of the 102 debenture bonds and claimed such payments as interest 4eductions on its income tax returns. Each gold bond, on its face, showed that petitioner promised to pay to the registered holder $1,000 on May 15, 1950, and interest thereon at the rate of eight percent per annum, semiannually on May and November 15th of each year. The bond provided, inter alia, that all 102 bonds were equally and ratably secured by the trust mortgage of May 15, 1930, to all the provisions *33 of which each bond and the rights of the holder thereof were subject and to which by the receipt of the bond the holder assented. Each debenture bond, on its face, shows that petitioner "promises to pay One Thousand Dollars ($1,000.00) to the bearer or order on May 15, 1970, with interest thereon at the rate of 8 per centum per annum. This bond is one of a series of bonds issued under the provisions of the resolution adopted by the company authorizing the issuance hereof." The debenture further recited that the company reserved the right to purchase at any time for cancellation any or all of said bonds at 102 per centum of the principal thereof, in addition to the interest then due; that any bond selected for purchase shall cease to bear interest after the date fixed for purchase, provided, notice to that effect shall have been published at least once in some newspaper of general circulation published in Providence at least 10 days before such date. No new capital came into the corporation by the exchange of stock for gold bonds in 1930 or by the exchange of gold bonds for debenture bonds in 1950. No reserve or sinking fund was ever set up on petitioner's books for the retirement of *34 the gold bond liability during 1950 or of the debenture liability due in 1970. Sometime subsequent to 1948 Peterson ceased to be president of petitioner. At the time this proceeding was heard he was living in Florida. The following schedules, according to the tax returns for the respective years, show petitioner's gross income, the respective officers' compensation, the net income or (loss) and the tax reported: 1953
1954
1955
1956
1957
1958
Gross Income
$47,553.16
$46,517.06
$44,558.82
$45,550.62
$56,569.35
$59,735.72
Officers' Compensation: W. D. Reynolds,
Pres.
2,380.00
2,400.00
4,650.00
2,600.00
3,892.00
4,869.44
R. G. Reynolds,
Vice Pres.
3,590.00
3,960.00
6,240.00
4,160.00
8,556.00
10,608.28
W. W. Reynolds,
Treas. *
2,800.00
4,000.00
4,000.00
5,000.00
7,000.00
7,000.00
C. A. Reynolds,
Secretary
2,380.00
2,400.00
4,650.00
2,600.00
3,892.00
4,869.44
Net Income (loss)
8,731.99
9,288.76 **
(173.92)
4,351.31 **
3,519.56 **
2,438.57 **
Tax Reported
2,079.37
2,071.04
0.00
624.99
253.73
365.79 The returns for 1955 through 1958 show that each officer devoted part-time to the business and that W. W. Reynolds owned *35 100 percent of the stock of the corporation. W. W. Reynolds died on January 7, 1960. Respondent determined "that the deduction for interest in the amount of $8,160 claimed on each of your tax returns for the taxable years 1956, 1957 and 1958 is not allowable for the reason that the amounts represent payments of dividends and as such are not deductible under any provision of the Internal Revenue Code of 1954." Opinion Whether the payments in question are deductible as interest, as petitioner contends, or whether they are nondeductible dividends, as respondent contends, depends on whether the debentures involved represent indebtedness or capital investment. "Interest * * * on indebtedness" is deductible. Section 163, Code of 1954. There is no provision that permits the deduction of dividends, but "dividend" is defined by section 316 of the 1954 Code. [9] *36 Our question is a factual one and the petitioner has the burden of establishing a debtor-creditor relationship between the petitioner and the debenture bondholders. . In determining similar questions the courts have applied various tests to determine whether advances to closely held corporations may be treated as loans for tax purposes and have stressed such factors as the debit ratio; the use to which the funds were put; whether outside investors would make such advances and lack of reasonable expectation of repayment. (C.A. 7, 1959). Other factors considered by the courts are the names given the instruments evidencing the indebtedness; the presence or absence of a maturity date; the source of the payments; the right to enforce the payment of principal and interest; participation in management; a status equal or inferior to that of regular creditors; payment of interest only out of "dividend" money and the ability of the corporation *37 to obtain loans from outside lending institutions. No single factor is determinative. ; (C.A. 9, 1960), affirming . As stated by the Supreme Court in at p. 530: There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. So-called stock certificates may be authorized by corporations which are really debts, and promises to pay may be executed which have incidents of stock. * * * And as stated in (C.A. 7, 1942), reversing : the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event. * * * In the instant case, if form was the only factor to be considered, we might have a debtor-creditor relationship as the instruments in question *38 purport to be evidences of indebtedness. The gold bonds and the debenture bonds, on their faces, are promises to pay at a fixed maturity date a sum certain and the interest payments were to be paid semiannually on the gold bonds and annually on the debenture bonds. We are not, however, limited to the instruments themselves as all other circumstances relating to them may be considered in determining the real intention of the parties. , affd. (C.A. 6, 1956), certiorari denied . The evidence clearly shows that the original stockholders, Reynolds and Peterson, intended their investments in petitioner to be at the risks of the venture. The original issues of stock in 1928 and 1929 were for land, money and services furnished to and rendered for the corporation. Such intent is also borne out by the minutes of the special meeting of the stockholders on July 23, 1929, when the articles of association were amended to permit the authorization of preferred stock in the amount of $100,000, divided into 1,000 shares of the par value of $100 each, and common stock, without par value, in the amount of 1,263 *39 shares. By the end of 1929 and at the beginning of 1930, petitioner's outstanding capital stock totaled $81,800, and an outstanding indebtedness (accounts payable) of only $606.04. After authorizing and making the exchange of 100 gold bonds for the outstanding stock and the issuance of 133 new shares of common stock at par value of $5 each, the capital stock was reduced to $665 and with the issuance of two gold bonds to the architects, the indebtedness as shown on the return was increased to $102,000 in bonds, plus $1,020 in accrued interest and accounts payable of $87.09. No appreciable amount of new money came into the corporation through the exchange and the 100 gold bonds, in the hands of the stockholders, still represented the capital invested in the corporation. The bonds were issued to the stockholders in proportion to their respective interests in the stock exchanged and the 133 shares of new common stock were issued to the bondholders in proportion to their respective interests in the gold bonds they had previously received. Thus the stockholders are the same as the holders of 100 of the 102 gold bonds and own the bonds in proportion, approximately, to their stockholdings. *40 In such an instance there is a strong inference that the bonds represent the original capital investments and not loans. (C.A. 7, 1959); (C.A. 4, 1961); , (1949), affd. per curiam, (C.A. 9, 1950), certiorari denied ; , affd. per curiam (C.A. 2, 1951); , affd. (C.A. 2, 1945). The same is true as to the exchange in 1950 of the gold bonds for the debenture bonds. Prior to the 1950 exchange Reynolds had acquired all the outstanding stock and 100 of the gold bonds, 61 of which had been deposited with the bank trustee, and two had been acquired by two of his sons. No new capital was brought into the corporation by the exchange and the debenture bonds represented the original equity capital. The debenture bonds did differ from the gold bonds in that the former were not secured by a trust mortgage and the interest was payable on an annual basis. It is significant that upon the exchange of the gold bonds for *41 the debenture bonds, the trustee discharged the trust mortgage it had held since May 15, 1930. The trustee, however, was controlled by Reynolds who was both the president and treasurer of the corporate trustee. It is reasonable to infer that the stockholders, who were also the bondholders in 1930 and again in 1950, did not expect the bonds to be paid at the maturity date. This is further evidenced by the failure of petitioner to set up on its books, either a reserve or sinking fund for the retirement of the liability shown by the bonds, and the fact that at the maturity date in 1950 there were no funds with which to pay the bondholders. It is also noted that prior to the exchange in 1930 the stockholders' equity was approximately 99 percent of petitioner's total assets and the indebtedness was about one percent of the total assets, and that after the exchange the stockholders' equity was reduced to about 7.6 percent of the assets and the indebtedness was increased to approximately 92 percent of the assets. Consequently, prior to the 1930 exchange, petitioner's debt to equity ratio was 1 to 142, and after the exchange, the debt to equity ratio was 12.15 to 1. Petitioner argues that *42 one of the purposes for the 1930 exchange was for Reynolds to acquire securities for the bank-trustee to hold as security for Reynolds' payments of alimony for the support of his wife and three minor children. The evidence does not support that contention. According to the separation agreement, as signed by both Reynolds and his wife, only $4,000 in unnamed marketable securities were to be put into the trust Reynolds was to execute, along with $1,000 in cash and two mortgages in the aggregate amount of $20,000 unless there was a substitution or exchange of securities or depreciation in the market value thereof. The separation agreement was executed in March of 1930, the divorce under decree nisi was issued on April 2, 1930, and on the latter date Reynolds executed the trust agreement with the corporate trustee. In the trust instrument, there was an acknowledgment that Reynolds had deposited and the trustee had received $1,000 in cash and securities in the value of $24,000. This was done prior to the issuance of the gold bonds for stock in May. While it is recognized that Reynolds, under the trust agreement, could withdraw and substitute securities at any time, it does not appear to *43 have been material that the securities to be deposited with the trustee had to be the securities of the petitioner. The only requirements were that the cash and securities were to be marketable and maintained at a value of $25,000. The record does not show that in 1930 any of the gold bonds, even to the extent of $4,000, were transferred to the banktrustee. There is evidence that in 1940 the securities held by the trustee were securities of petitioner, but there is no showing of the number and kind of securities held. Whatever they were they appear not to have been sufficient to satisfy the trustee as it also held life insurance policies in the aggregate amount of $45,000 to support the securities. By 1950 Reynolds had acquired 100 of the gold bonds and had deposited 61 of them with the trustee. While there is evidence that the trustee had no title to the original securities prior to 1939 or 1940, and had received no payments on them and there is an inference that later the trustee received title to securities and collected payments thereon, which were paid to Reynolds, he having made timely payments to his divorced wife, there is no showing that the transfer was recorded on petitioner's *44 books. Furthermore, the record shows that in 1950 when the gold bonds were exchanged for the debenture bonds, all gold bonds, including the 61 held by the trustee, were surrendered to the corporation, even though the mortgage securing the payment of the gold bonds was discharged by the mortgagetrustee and no new security for the payment of the debenture bonds was given. This may explain why the bank-trustee requested other or additional securities in order to assure its ability to carry out the terms of the trust and in 1956 Reynolds withdrew those on deposit and substituted therefor other securities. It thus does not appear that the issuance of gold bonds in 1930 or the issuance of debenture bonds in 1950 was necessary for the creation of, or for the performance of the terms of the trust. Certainly they were not performing such a purpose at the latter part of 1956. Whether the debentures were marketable at any time is not shown. Petitioner also argues that Peterson had a business purpose in making the 1930 exchange, but no satisfactory evidence of such intention was presented. At the time this proceeding was heard Peterson was living in Florida and there is no showing why his testimony *45 was not available. Petitioner also stresses the fact that the deductions claimed as interest deductions prior to the taxable years were not questioned by the respondent. The fact that he made no determination in the previous years does not prevent him from making a determination later. If he were in error in not making a determination he is not called on to perpetuate the error. Nor may petitioner continue to avail itself of the tax benefits it has enjoyed because of prior inaction of the respondent. Petitioner has cited many cases in support of its contention and to analyze each of them would unnecessarily prolong this Opinion. Each case was decided on its own peculiar facts and would not be authority for determining the question here. That determination must be made on the facts presented by this record. In the light of the whole record before us which we have carefully considered, petitioner has failed to establish that the debenture bonds in question represent a creditor interest rather than an equity interest. It follows that petitioner is not entitled to the deductions claimed and that respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. According to the minutes of the stockholders' first meeting of January 24, 1928, Peterson was due to receive 88 shares of common stock and 136 shares of preferred stock in the exchange of land and an additional 160 shares for services rendered and money expended for the corporation. Whether or not he owned the 88 shares of common stock at the end of the year is not shown. The showing of ownership of 144 shares instead of 136 shares of preferred stock is due to an error in the issuance of the stock, as explained herein below.
2. There seems to be a variance in stating 196 shares of common stock instead of 204 shares as the original 204 issue was referred to as preferred stock.↩
3. The record does not reveal that the 17 shares were issued, and if issued, it is not shown to whom they were issued and in what proportion.↩
4. The reported stockholdings do not agree with the issues previously authorized.↩
5. The name, apparently of the same individual, apears as "Robert A. Reynolds" in the agreement, as "Robert G. Reynolds, Vice Pres." on petitioner's returns for the years 1953, 1954 and 1955, and as "Robert J. Reynolds, Vice Pres." on petitioner's returns for the years 1956, 1957 and 1958. We have accepted "Robert G. Reynolds" as it appears as such in the stipulation of facts.
6. The minutes reflect that the meeting was in accordance with a notice signed by the president; that all stockholders were present in person or by proxy; that the meeting was called to order by the treasurer; and that Edward G. Fletcher was elected "Secretary Pro Tem" and acted as secretary to the meeting.↩
7. The minutes show that Charles P. Sisson had resigned as a director and that Daniel F. Harrington was elected to fill the vacancy.↩
8. From the record before us, the number of shares of stock both preferred and common, exchanged for gold bonds, cannot be reconciled with the number of shares issue and outstanding prior to their exchange.↩
*. The four officers are W. W. Reynolds and three sons. ↩
**. Taxable income before taking dividend received deduction under Schedule K.↩
9. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - * * *
(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *↩