**RIALTO REALTY COMPANY, INC.**

**v.**

**UNITED STATES of America.**

Civ. A. No. 72–229.

United States District Court,
E. D. Pennsylvania.

Nov. 2, 1973.

Robert Margolis, Herbert L. Levy, Bethlehem, Pa., for plaintiff.

Donald R. Anderson, Robert J. Hipple, Dept. of Justice, Washington, D. C., for defendant.

### MEMORANDUM AND ORDER

HUYETT, District Judge.

This is a federal tax refund case in which plaintiff, Rialto Realty Company, Inc., challenges defendant's disallowance of interest deductions[1] taken by plaintiff for the years 1963 through 1967. The case presents the frequently litigat-

---

1. 26 U.S.C. § 163 provides:
   (a) *General Rule.*—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

26 C.F.R. § 1.163–1 provides:
   (c) * * * So-called interest on preferred stock, which is in reality a dividend thereon, cannot be deducted in computing taxable income.

ed question whether certain corporate obligations represent debt or equity.[2] The parties have stipulated to the facts. This opinion represents our findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a). Jurisdiction is conferred by 28 U.S.C. § 1346(a)(1) (1970).

## FACTS

This action involves interest payments made by the Plaintiff, Rialto Realty Company, Inc., to holders of its 6% Mortgage Bonds Plaintiff issued on January 1, 1954. The Commissioner of Internal Revenue (Commissioner) disallowed as a deduction on the Federal income tax returns filed by the Plaintiff for the years 1963 through 1967, inclusive, the total amount of the interest payments as follows:

| Year | Mortgage Bond Interest Paid | Amount Disallowed |
|------|------|------|
| 1963 | $12,000 | $12,000 |
| 1964 | 10,500 | 10,500 |
| 1965 | 6,750 | 6,750 |
| 1966 | 4,500 | 4,500 |
| 1967 | 6,000 | 6,000 |

Plaintiff paid the deficiencies assessed by the Commissioner attributable to disallowance of deductions for the interest payments, paid interest on said deficiencies, and filed timely Claims for Refund as follows:

| Year | Income Tax Deficiency Paid | Interest on Deficiency Paid | Amount of Claim for Refund |
|------|------|------|------|
| 1963 | $ 6,240.00 | $1,533.93 | $ 7,773.93 |
| 1964 | 5,250.00 | 975.56 | 6,225.56 |
| 1965 | 1,365.00 | 171.75 | 1,536.75 |
| 1966 | 2,160.00 | 220.26 | 2,380.26 |
| 1967 | 2,788.00 | 116.83 | 2,904.83 |
| | $17,803.00 | $3,018.33 | $20,821.33 |

After the Commissioner disallowed the Claims for Refund, Plaintiff commenced this action.

Rialto Realty Company, Inc. was organized on December 11, 1947 and continuously has maintained its principal place of business in Allentown, Pennsylvania. The original Certificate of Incorporation provided, in Article Fourth, for an authorized capital stock of 2,000 shares of $100 par preferred stock and 5,000 shares of no par value common stock, all of which was issued at the time of incorporation and remained outstanding thereafter. As of December 31, 1953, the authorized and outstanding stock of the corporation was held by the following individuals, all of whom are related:

| Stockholder | Common Stock | Preferred Stock |
|------|------|------|
| Morris Senderowitz | 1,250 | 500 |
| Lena Senderowitz | 1,250 | 500 |
| Anna S. Jalkut | 416⅔ | 250 |
| Robert Senderowitz | 416⅔ | 375 |
| Samuel J. & Ethel J. Senderowitz | 416⅔ | 375 |
| Mae S. Gabriel | 416⅔ | 0 |
| Hattie Sachs | 416⅔ | 0 |
| Gertrude S. Rapoport | 416⅔ | 0 |
| Total shares | 5,000 | 2,000 |
| Stated or Par Value | $4.50 | $100 |
| Total Capital | $22,500.00 | $200,000.00 |

In 1953, the board of directors, then consisting of Morris Senderowitz, Lena Senderowitz, Anna Senderowitz Jalkut, and Robert Senderowitz proposed a plan to reorganize the capital structure of the corporation. The plan of reorganization provided, *inter alia*: (a) that the no par value common stock and the $100.00 par value preferred stock be eliminated, and, in lieu thereof, that there should be 5,000 shares of $100.00 par value common stock, (b) that all the shareholders of the 5,000 shares of no par value common stock should exchange their shares for a total of 1,000 shares of the $100.00 par value common stock in the ratio of five (5) shares of no par common for one (1) share $100.00 par common, and (c) that the shareholders of the 2,000 shares of $100.00 preferred stock should exchange said stock for Plaintiff's $1,000 face value 6% Mortgage Bonds in the ratio ten (10) shares of preferred stock for one (1) Mortgage Bond.

---

2. For a general discussion of this issue, see B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 4.04(3d ed. 1971); Mertens, 4A Law of Federal Income Taxation § 26.10 (1972).

The stated purposes of this reorganization, according to the corporate minutes, were:

1. To lay the ground work and to simplify the necessity for corporate action for any major improvements or alterations to the premises of the Corporation, since it will only be necessary to deal with one class of Stockholders.

2. To simplify the classes of stock outstanding so that there will be only one class of stock, to wit, common, and also to eliminate the potential voting differences inherent by the preferred and common Stockholders.

3. To eliminate the premium to be paid to preferred Stockholders ($10.00 over par) upon the retirement of their stock, since the bonds will only be redeemable at par.

4. To eliminate the necessity of recalling all of the preferred stock at one time whereas the mortgage bonds can be redeemed in installments at the option of the Corporation.

5. To effect a substantial saving in corporate taxes, although not in personal taxes of the preferred Stockholders, since the interest on the bonds, but not the dividends on the preferred stock, constituted a legitimate deduction on the taxable income of the Corporation.

The minutes also reflect the following:

The President [Morris Senderowitz] further reported that the preferred Stockholders will retain their priority of distribution because the bonds will be payable ahead of common Stockholders, but the amount of their proprietary interest in the Corporation will not be altered because the preferred stock was and the bonds will be payable in fixed amounts. [Exhibit "A" to Stipulation of Facts].

This proposal for reorganization was carried out by the filing of an Amendment to the Certificate of Incorporation on June 23, 1953, making the change in the capital structure effective January 1, 1954.[3] On that date, the stockholders exchanged their preferred and common stock proportionately for bonds and new common stock in the following manner:

| Stockholder | Old Common | | New Common | |
|---|---|---|---|---|
| | No. | Value | No. | Value |
| Morris Senderowitz | 1,250 | $ 5,625 | 250 | $ 25,000 |
| Lena Senderowitz | 1,250 | 5,625 | 250 | 25,000 |
| Anna S. Jalkut | 416⅔ | 1,958 | 83⅓ | 8,333 |
| Robert Senderowitz | 416⅔ | 1,958 | 83⅓ | 8,333 |
| S. J. and E. J. Senderowitz | 416⅔ | 1,958 | 83⅓ | 8,333 |
| Mae S. Gabriel | 416⅔ | 1,958 | 83⅓ | 8,333 |
| Hattie Sachs | 416⅔ | 1,958 | 83⅓ | 8,333 |
| Gertrude S. Rapoport | 416⅔ | 1,958 | 83⅓ | 8,333 |
| TOTALS | 5,000 | $22,500 | 1,000 | $100,000 |

| | Old Preferred | | Bonds | |
|---|---|---|---|---|
| | No. | Value | No. | Value |
| Morris Senderowitz | 500 | $ 50,000 | 50 | $ 50,000 |
| Lena Senderowitz | 500 | 50,000 | 50 | 50,000 |
| Anna S. Jalkut | 250 | 25,000 | 25 | 25,000 |
| Robert Senderowitz | 375 | 37,500 | 38 | 38,000 |
| S. J. and E. J. Senderowitz | 375 | 37,500 | 37 | 37,000 |
| Mae S. Gabriel | 0 | 0 | 0 | 0 |
| Hattie Sachs | 0 | 0 | 0 | 0 |
| Gertrude S. Rapoport | 0 | 0 | 0 | 0 |
| TOTALS | 2,000 | $200,000 | 200 | $200,000 |

To document the exchange of preferred stock into the bonds, a Trust Indenture Agreement (Indenture) was entered into on the same day as the exchange, January 1, 1954, with the Merchants National Bank of Allentown as Trustee (Trustee), to secure plaintiff's repayment of the bonds. A second mortgage on certain real estate of the corporation was given to the bank as collateral for the agreement. In transforming the preferred stock into mortgage bonds, no new capital was invested in or received by plaintiff corporation, the exchange being solely of preferred stock for the bonds.

The Indenture provided for the issuance by the Plaintiff of two hundred (200) bearer Mortgage Bonds, with interest coupons attached, of the denomination of One Thousand ($1,000.00) Dol-

---

3. The Amendment to Article Fourth of the Certificate of Incorporation provided that "the total number of shares of all classes of stock which the corporation is authorized to issue is 5,000 shares consisting entirely of common stock of the par value of each share of One Hundred ($100.00) Dollars."

lars each, to be dated January 1, 1954, due on January 1, 1974, and bearing a fixed rate of interest payable semi-annually on each January 1st and July 1st at the rate of six percent (6%) per annum. The Indenture further provides that:

(a) the Plaintiff, in its sole discretion, has .the right to redeem any and all of the Mortgage Bonds at any time after January 1, 1955 and prior to January 1, 1974, the Bonds to be redeemed being chosen by the Trustee by random drawing (Article IV).

(b) default would occur under the Indenture if

(1) Plaintiff fails to pay any insurance premiums or any taxes and assessments imposed against the real property and fixtures (Article II), or

(2) Plaintiff fails to pay the principal of or interest on the Mortgage Bonds (Article III).

(c) only the Trustee has a right of action to levy on the mortgaged property or to foreclose the mortgage, these rights cannot be asserted by the bondholders (Art. V § 2).

(d) the Trustee is not obligated to bring any suit under the mortgage or "do anything whatsoever as Trustee" until it is indemnified to its satisfaction from all loss and expense and all possible claims for damages for which it may become liable or responsible. (Art. V § 2).

(e) In the case of. default, the Trustee cannot take action unless so instructed by seventy-five percent of the bondholders. (Art. V § 3).

Any bondholder is permitted to assign, independent of his stock ownership, if any, his right, title and interest in, to and under the coupons attached to the Mortgage Bonds, as well as the Mortgage Bonds, which interest however, is subject to a collateral agreement authorizing the corporation to subordinate the bondholders' interest to any future lien that the corporation might create. (Art. I § 3). The bondholders have no right to participate in manage-ment of the Plaintiff either directly, through the election of one or more directors, or on the occurrence of a specified contingency. As stated above, in the event of a default in an interest or principal payment, the bondholders, through the Trustee, have the right to enforce payment by a foreclosure against the Plaintiff's real estate in addition to all other remedies available to them at law or in equity for the collection of their debt. All required payments of interest on the Mortgage Bonds have been timely made. None of the Mortgage Bonds have been subordinated to the claim of any creditors, including trade creditors of the Plaintiff, with the exception of the holder of the first mortgage, which mortgage was satisfied in 1961.

On the same date, however, that the mortgage bonds were created to replace the preferred stock, the Trustee, stockholders and bondholders executed express subordination agreements. These agreements provide as follows (with some minor differences in language between the two agreements):

In the event that, as long as the aforesaid mortgage [the second mortgage securing the bonds] remains a lien of record, the Corporation may have to refinance the capital structure of the Corporation in order to make alterations, improvements, major repairs or additions to the mortgaged premises *or in the event that it becomes necessary to refinance its capital structure or to borrow additional capital for any reason,* in which events it may be necessary to create a mortgage lien prior to the mortgage held by the Trustee for the benefit of the Bondholders, then it is agreed and understood that any new mortgage executed and delivered by the Corporation for .said purposes shall, if necessary, become a prior lien to the lien of the mortgage held for the benefit of the Bondholders and the Trustee is authorized to execute and acknowledge a subordination agreement or agreements, subordinating the lien of this mortgage for the benefit of the Bond-

holders to a prior lien that may be executed by the Corporation for the purpose of refinancing its capital structure as more fully provided for herein. (Emphasis added).

Following satisfaction of the first mortgage in 1961, the second mortgage became, from that date through the present, including the years in issue, a first mortgage. Since January 1, 1954, through the present date, no new long term indebtedness has been incurred by the Plaintiff.

The comparative balance sheets for the corporation on December 31, 1953, just prior to the exchange, and December 31, 1954, the end of the first year after the exchange [4] were as follows:

## ASSETS

|  | Dec. 31, 1953 | | Dec. 31, 1954 | |
|---|---|---|---|---|
| **Current Assets** | | | | |
| Cash | $ 1,023.82 | | $ 1,557.33 | |
| Accounts Receivable | 945.00 | | 1,575.00 | |
|  | | $ 1,968.82 | | $ 3,132.33 |
| **Fixed Assets** | | | | |
| Land | $150,000.00 | | $150,000.00 | |
| Buildings (less depr.) | 226,893.62 | | 212,315.85 | |
| New Building (less depr.) | 326,901.46 | | 319,735.50 | |
|  | | $703,795.08 | | $682,051.35 |
| **Other Assets** | | | | |
| Investment | | 5,000.00 | | 5,000.00 |
| TOTAL ASSETS | | $710,763.90 | | $690,183.68 |

## LIABILITIES AND CAPITAL

|  | | | | |
|---|---|---|---|---|
| **Current Liabilities** | | | | |
| Accounts Payable | –0– | | $ 15,752.44 | |
| Accrued Interest Payable | $ 3,066.66 | | 8,666.67 | |
| Accrued Taxes Payable | 17,744.44 | | 6,148.37 | |
| Guarantee Rent Account | 1,000.00 | | 1,000.00 | |
| Note Payable—Bank | 10,000.00 | | –0– | |
| Loan Payable (Est. of Rose Senderowitz) | 33,000.00 | | 34,500.00 | |
| Loan Payable (Max Senderowitz) | 3,500.00 | | 7,500.00 | |
|  | | $ 68,311.10 | | $ 73,567.48 |
| **Fixed Liabilities** | | | | |
| Mortgage Payable | $300,000.00 | | $260,000.00 | |
| Second Mortgage Bonds Payable | –0– | | 200,000.00 | |
|  | | | | $460,000.00 |
| **Capital & Surplus** | | | | |
| Preferred Stock | $200,000.00 | | –0– | |
| Common Stock | 22,500.00 | | | |
| Earned Surplus | | 222,500.00 | | 100,000.00 |
|  | | 119,952.80 | | 56,616.20 |
| TOTAL LIABILITIES & CAPITAL | | $710,763.90 | | $690,183.68 |

---

4. No opening balance sheet as of January 1, 1954, the date of the reorganization of the capital structure, has been made a part of the record.

During the twenty-year period commencing January 1, 1948 and ending December 31, 1967, Plaintiff's total net income after taxes was $487,901. During that same period the excess "Working Capital" (difference between *Funds Provided* from net income, depreciation and other items and *Funds Used* for additions to fixed assets, investments, dividends and other items) was $535,636 which amount was used to retire $555,000 of Plaintiff's long term debt consisting of the first mortgage on the real estate and fifty (50%) per cent ($100,000) of its Mortgage Bonds. During the twenty-year period the cumulative effect on Working Capital was to reduce it by $19,634 ($555,000 debt retired minus $535,636 excess Working Capital).

Following the reorganization of its capital structure, Plaintiff began making interest payments on the newly created mortgage bonds, deducting the interest payments from its income and thereby reducing its federal corporate income tax liability. Following examination and audit of Plaintiff's corporate income tax returns for the year 1963 through 1967, inclusive, it was determined that these interest deductions were improper because the mortgage bonds, though appearing to be a debt in form, in reality represented a continuing long-term equity investment in the corporation by the former preferred stockholders. Consequently, the interest deductions claimed were disallowed for each year, and the deficiencies in taxes and interest, which are the subject of this suit for refund, were assessed and collected.

## DISCUSSION

■ In Fin Hay Realty Company v. United States, 398 F.2d 694 (3 Cir. 1968) the court enumerated the following "criteria by which to judge the true nature of an investment which is in form a debt: (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation." Fin Hay Realty Co., Inc. v. United States, 398 F.2d supra, at 696. [footnote omitted] [5] While specifying these criteria, the court also noted:

> The various factors which have been identified in the cases are only aids in relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors:
>
> (1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,
>
> (2) whether there is subordination to or preference over any indebtedness of the corporation,
>
> (3) the ratio of debt to equity of the corporation,

5. See also 26 U.S.C. § 385 (1970) which provides as follows:

Treatment of certain interests in corporations as stock or indebtedness

(a) Authority to prescribe regulations.— The Secretary or his delegate is authorized to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness.

(b) Factors.—The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor

answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship.

Fin Hay Realty Co., Inc. v. United States, *supra*, 398 F.2d at 697 [footnote omitted]. Finally, the court warned:

Where the corporation is closely held . . . and the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull. This is particularly so where a shareholder can have the funds he advances to a corporation treated as corporate obligations instead of contributions to capital without affecting his proportionate equity interest. Labels, which are perhaps the best expression of the subjective intention of parties to a transaction, thus lose their meaningfulness.

Fin Hay Realty Co., Inc. v. United States, *supra*, 398 F.2d at 697. And, it is clear that the burden of proving "the reality of the indebtedness" is on the taxpayer. See P. M. Finance Corporation v. Commissioner of Internal Revenue, 302 F.2d 786, 789 (3 Cir. 1962). The principles enumerated in Fin Hay were recently reaffirmed in Trans-Atlantic Company v. Commissioner of Internal Revenue, 469 F.2d 1189 (3 Cir. 1972).

In addition, when considering cases in which the purported debt is issued in exchange for stock, courts have emphasized (1) whether any new capital was introduced as a result of the exchange, (2) whether there was any true business purpose for the exchange apart from the creation of an interest deduction, and (3) whether the holders of the purport-

(4) whether there is convertibility into the stock of the corporation, and

(5) the relationship between holdings of stock in the corporation and holdings of the interest in question.

ed debt instrument are in essentially any different position than they were prior to the issuance of the purported debt. See Sayles Finishing Plants, Inc. v. United States, 399 F.2d 214, 185 Ct.Cl. 196 (1968); Mullin Building Corp. v. Commissioner of Internal Revenue, 9 T. C. 350 (1947) aff'd per curiam, 167 F.2d 1001 (3 Cir. 1948); Louisquisset Golf Club, Inc. v. Commissioner of Internal Revenue, 21 T.C.M. 1577 (1962). Thus, in Wetterau Grocer Co., Inc. v. Commissioner of Internal Revenue, 179 F.2d 158 (8 Cir. 1950) the court held that notes issued in exchange for preferred stock did not constitute debt and disallowed claimed interest deductions. The court stated:

These notes were not issued for borrowed money. They represented no new contribution to capital. They were exchanged for oustanding preferred stock which had been issued as a stock dividend to the common stockholders. The holders of these notes were the common stockholders and these notes simply supplanted the outstanding preferred stock. There is no apparent business advantage to the taxpayer unless by this transaction it will be enabled to deduct as a necessary expense the amount paid as interest on these notes. Had the amount been paid as dividends on the preferred stock, confessedly no deduction could be had.

Wetterau Grocer Co., Inc. v. Commissioner of Internal Revenue, *supra*, 179 F.2d at 160.

Consideration of these factors requires a finding that the bonds issued in this case were an equity interest and the deductions taken by plaintiff were properly disallowed. Plaintiff places reliance on its fulfillment of the formal requirements of indebtedness and its success in making repayment on the debt. Thus, it is observed by plaintiff

The Secretary has not as of this time exercised the authority granted to him by 26 U.S.C. § 385.

that the bonds have a fixed maturity date, that the bondholders *qua* bondholders have no authority to participate in management and that the obligation in issue was titled "Rialto Realty Company, Inc. Six Percent Mortgage Legal Tender Bonds".

Plaintiff's reliance on other relevant factors seems, however, misplaced. Thus, plaintiff argues that the bondholders have substantial remedies to enforce the obligation. But the bondholders can exercise these remedies only through the trustee who must first be fully indemnified for any possible loss. Compare Trans-Atlantic Company v. Commissioner of Internal Revenue, *supra,* 469 F.2d at 1193, n. 7. In addition, the remedies are available only if seventy-five (75%) percent of the bondholders concur in enforcing the remedies. *See* 1432 Broadway Corporation, 4 T.C. 1158 (1945). Furthermore, while it is true that the bondholders' interest was subordinated only to the first mortgage secured in 1948, and then only until 1961 when the first mortgage was paid off, the bonds when issued were subject to collateral agreements allowing plaintiff to further subordinate the bond interest "if it became necessary . . . to borrow additional capital for any reason." Surely an outside lender would not have agreed to such a provision. See Fin Hay Realty Co., Inc. v. United States, *supra,* 398 F.2d at 697.

It is argued by plaintiff that its ability to obtain lending, other than from the first mortgagee and the bondholders, demonstrates the debt nature of the bond issue. We must agree, however, with defendant that such lending of a short-term nature and from non-stockholder relatives is not probative of plaintiff's credit ability. Other than the bondholders and the first mortgage, which would in any case have priority over any subsequent liens, plaintiff has never had any long-term debt obligations.

Plaintiff places its debt-equity ratio at 8.8:1, whereas defendant places the ratio at 20:1. Plaintiff, however, ignores the first mortgage because leases for plaintiff's property existing at the time of recapitalization were with prime tenants and were for a term adequate to guarantee amortization of the entire long-term first mortgage. Again, however, an outside lender would surely be concerned with the priority of the first mortgage in considering to purchase plaintiff's bonds. The more economically realistic debt-equity ratio is 20:1. And, plaintiff can find no comfort in Leach Corporation v. Commissioner of Internal Revenue, 30 T.C. 563 (1958) in which the tax court held that a high debt-equity ratio is not fatal when it is clear that the corporate obligation is a debt. In addition to considering the question in *Leach* a close one because of the high debt-equity ratio, the court made the following observations which are pertinent to the issue before us:

> The bonds had a comparatively early maturity date and were in fact paid off even prior thereto. The history of the venture, particularly the requirements of the Bank of England, point to an intention to establish a debtor-creditor relationship. The sharply disproportionate ratio between ownership of stock and bonds goes far to overcome the high debt-equity ratio here. The bondholders owned only some 48 percent of the stock. The situation would be quite different had all the stock and bonds been owned by same interest in substantially the same proportion . . . [W]here the disproportion is so substantial and where the parties are so completely unrelated . . . such disproportion tends strongly to neutralize the inferences that might otherwise be drawn from the high debt-equity ratio.

Leach Corporation v. Commissioner of Internal Revenue, *supra,* 30 T.C. at 579. In the case before us the bondholders owned 75% of the stock. The high debt-equity ratio is, therefor, extremely relevant in determining whether the bonds represent debt or equity.

Finally, we consider it significant that no new capital was introduced into the corporation as a result of the exchange of preferred stock for the bonds. John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946), relied on by plaintiff, involved an infusion of new capital since only 25 percent of the bonds were sold to shareholders. And, contrary to plaintiff's contention, Cleveland Adolph Mayer Realty Corp. v. Commissioner of Internal Revenue, 6 T.C. 730 (1946) did not involve an exchange of bonds for preferred stock, but simply the issuance of bonds. Thus, there was in that case an infusion of new capital.

For these reasons, we consider the conclusion inescapable that the bonds issued by plaintiff were in substance equity and that defendant properly disallowed interest deductions on the bonds for the years 1963 through 1967, inclusive. Judgment shall be entered in favor of defendant and against plaintiff.