**FIN HAY REALTY CO., Appellant,**

v.

**UNITED STATES of America.**

**No. 16582.**

United States Court of Appeals
Third Circuit.

Argued Feb. 8, 1968.

Decided June 20, 1968.

Herbert L. Zuckerman, Newark, N. J., for appellant.

Melva M. Graney, Appellate Section, Tax Division, Department of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Donald A. Statland, Attys., Department of Justice, Washington, D. C., David M. Satz, Jr., U. S. Atty., on the brief), for appellee.

Before HASTIE, Chief Judge, and FREEDMAN and VAN DUSEN, Circuit Judges.

OPINION OF THE COURT

FREEDMAN, Circuit Judge.

We are presented in this case with the recurrent problem whether funds paid to

a close corporation by its shareholders were additional contributions to capital or loans on which the corporation's payment of interest was deductible under § 163 of the Internal Revenue Code of 1954.[1]

The problem necessarily calls for an evaluation of the facts, which we therefore detail.

Fin Hay Realty Co., the taxpayer, was organized on February 14, 1934,[2] by Frank L. Finlaw and J. Louis Hay. Each of them contributed $10,000 for which he received one-half of the corporation's stock and at the same time each advanced an additional $15,000 for which the corporation issued to him its unsecured promissory note payable on demand and bearing interest at the rate of six per cent per annum. The corporation immediately purchased an apartment house in Newark, New Jersey, for $39,000 in cash. About a month later the two shareholders each advanced an additional $35,000 to the corporation in return for six per cent demand promissory notes and next day the corporation purchased two apartment buildings in East Orange, New Jersey, for which it paid $75,000 in cash and gave the seller a six per cent, five year purchase money mortgage for the balance of $100,000.

Three years later, in October, 1937, the corporation created a new mortgage on all three properties and from the proceeds paid off the old mortgage on the East Orange property, which had been partially amortized. The new mortgage was for a five year term in the amount of $82,000 with interest at four and one-half per cent. In the following

three years each of the shareholders advanced an additional $3,000 to the corporation, bringing the total advanced by each shareholder to $53,000, in addition to their acknowledged stock subscriptions of $10,000 each.

Finlaw died in 1941 and his stock and notes passed to his two daughters in equal shares. A year later the mortgage, which was about to fall due, was extended for a further period of five years with interest at four per cent. From the record it appears that it was subsequently extended until 1951.[3] In 1949 Hay died and in 1951 his executor requested the retirement of his stock and the payment of his notes. The corporation thereupon refinanced its real estate for $125,000 and sold one of the buildings. With the net proceeds it paid Hay's estate $24,000 in redemption of his stock and $53,000 in retirement of his notes.[4] Finlaw's daughters then became and still remain the sole shareholders of the corporation.[5]

Thereafter the corporation continued to pay and deduct interest on Finlaw's notes, now held by his two daughters. In 1962 the Internal Revenue Service for the first time declared the payments on the notes not allowable as interest deductions and disallowed them for the tax years 1959 and 1960. The corporation thereupon repaid a total of $6,000 on account of the outstanding notes and in the following year after refinancing the mortgage on its real estate repaid the balance of $47,000. A short time later the Internal Revenue Service disallowed the interest deductions for the years 1961 and 1962. When the corporation

1. Section 163(a) provides: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

2. The formal date of incorporation was March 1, 1934.

3. The corporation's tax returns show a continuing decline in the principal of the debt until that year.

4. The record is fragmentary and provides no clear basis from which to reconstruct the events of 1951. It may perhaps be inferred from it that Hay's estate re-

ceived the total of $77,000 solely for the redemption of his stock and that the notes of $53,000 were retired either from the proceeds of the sale of real estate or in some other manner during the same year. In such event the total paid in redemption of Hay's stock and the retirement of his notes would be $130,000 rather than $77,000.

5. The husband of one of the daughters, who is a director of the corporation, holds a single qualifying share and his wife holds one share less than her sister.

failed to obtain refunds it brought this refund action in the district court. After a nonjury trial the court denied the claims and entered judgment for the United States. 261 F.Supp. 823 (D.N. J.1967). From this judgment the corporation appeals.

This case arose in a factual setting where it is the corporation which is the party concerned that its obligations be deemed to represent a debt and not a stock interest. In the long run in cases of this kind it is also important to the shareholder that his advance be deemed a loan rather than a capital contribution, for in such a case his receipt of repayment may be treated as the retirement of a loan rather than a taxable dividend.[6] There are other instances in which it is in the shareholder's interest that his advance to the corporation be considered a debt rather than an increase in his equity. A loss resulting from the worthlessness of stock is a capital loss under § 165(g), whereas a bad debt may be treated as an ordinary loss if it qualifies as a business bad debt under § 166. Similarly, it is only if a taxpayer receives debt obligations of a controlled corporation[7] that he can avoid the provision for nonrecognition of gains or losses on transfers of property to such a corporation under § 351.[8] These advantages in having the funds entrusted to a corporation treated as corporate obligations instead of contributions to capital have required the courts to look beyond the literal terms in which the parties have cast the transaction in order to determine its substantive nature.

In attempting to deal with this problem courts and commentators have isolated a number of criteria by which to judge the true nature of an investment which is in form a debt: (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.[9]

While the Internal Revenue Code of 1954 was under consideration, and after its adoption, Congress sought to identify the criteria which would determine whether an investment represents a debt or equity, but these and similar efforts have not found acceptance.[10] It

---

6. The partial retirement of an equity interest may be considered as essentially equivalent to a dividend under § 302, while the repayment of even a debt whose principal has appreciated is taxed only as a capital gain under § 1232.

7. While not all debt obligations qualify for the desired tax treatment, equity interests can never qualify.

8. A taxpayer might wish to avoid § 351 when he transfers depreciated property to the corporation and seeks to recognize the loss immediately and also when the transferred property is to be resold by the corporation but will not qualify for capital gains treatment in the hands of the corporation.

9. See J. S. Biritz Construction Co. v. Commissioner of Internal Revenue, 387 F.2d 451 (8 Cir. 1967); Tomlinson v. 1661 Corporation, 377 F.2d 291 (5 Cir. 1967); Smith v. Commissioner of Internal Revenue, 370 F.2d 178 (6 Cir. 1966); Gilbert v. Commissioner of Internal Revenue, 262 F.2d 512 (2 Cir. 1959); 4A Mertens, Law of Federal Income Taxation, §§ 26.10a, 26.10c (1966).

10. The original House version of the 1954 Code, H.R. 8300, 83d Cong., 2d Sess., contained a provision, § 312, which dis-

still remains true that neither any single criterion nor any series of criteria can provide a conclusive answer in the kaleidoscopic circumstances which individual cases present. See John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278 (1946).

■ The various factors which have been identified in the cases are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship.[11] Since there is often an element of risk in a loan, just as there is an element of risk in an equity interest, the conflicting elements do not end at a clear line in all cases.

In a corporation which has numerous shareholders with varying interests, the arm's-length relationship between the corporation and a shareholder who supplies funds to it inevitably results in a transaction whose form mirrors its substance. Where the corporation is closely held, however, and the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull. This is particularly so where a shareholder can have the funds he advances to a corporation treated as corporate obligations instead of contributions to capital without affecting his proportionate equity interest. Labels, which are perhaps the best expression of the subjective intention of parties to a transaction, thus lose their meaningfulness.

■ To seek economic reality in objective terms of course disregards the personal interest which a shareholder may have in the welfare of the corporation in which he is a dominant force. But an objective standard is one imposed by the very fact of his dominant position and is much fairer than one which would presumptively construe all such transactions against the shareholder's interest. Under an objective test of economic reality it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only.

In the present case all the formal indicia of an obligation were meticulously made to appear. The corporation, however, was the complete creature of the two shareholders who had the power to create whatever appearance would be of tax benefit to them despite the economic reality of the transaction. Each shareholder owned an equal proportion of stock and was making an equal additional contribution, so that whether Finlaw and Hay designated any part of their additional contributions as debt or as stock would not dilute their proportionate equity interests. There was no re-

tinguished between "securities", "participating stock", and "nonparticipating stock". Only payments with regard to "securities" were deductible by the corporation as interest. See proposed § 275. "Securities" were defined as unconditional obligations to pay a sum certain with an unconditional interest requirement not dependent on corporate earnings. The Senate rejected the proposed classification on the ground that it was inflexible. See S.Rep. No. 1622, 83d Cong., 2d Sess., 1954 U.S.C.Cong. & Admin.News, pp. 4621, 4673.

A similar list of determinants was proposed in 1957 by an advisory group to a subcommittee of the House Committee on Ways and Means, but was not acted upon.

In 1954 the American Law Institute embodied such a test in § x500 of its draft income tax statute. See ALI Federal Tax Project, Income Tax Problems of Corporations and Shareholders 396 (1958).

11. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, § 4.04, at 127 (2d ed. 1966); Stone, Debt-Equity Distinctions in the Tax Treatment of the Corporation and Its Shareholders, 42 Tulane L.Rev. 251, 253–62 (1968).

striction because of the possible excessive debt structure, for the corporation had been created to acquire real estate and had no outside creditors except mortgagees who, of course, would have no concern for general creditors because they had priority in the security of the real estate. The position of the mortgagees also rendered of no significance the possible subordination of the notes to other debts of the corporation, a matter which in some cases this Court has deemed significant.[12]

The shareholders here, moreover, lacked one of the principal advantages of creditors. Although the corporation issued demand notes for the advances, nevertheless, as the court below found, it could not have repaid them for a number of years. The economic reality was that the corporation used the proceeds of the notes to purchase its original assets,[13] and the advances represented a long term commitment dependent on the future value of the real estate and the ability of the corporation to sell or refinance it. Only because such an entwining of interest existed between the two shareholders and the corporation, so different from the arm's-length relationship between a corporation and an outside creditor, were they willing to invest in the notes and allow them to go unpaid for so many years while the corporation continued to enjoy the advantages of uninterrupted ownership of its real estate.

It is true that real estate values rose steadily with a consequent improvement in the mortgage market, so that looking back the investment now appears to have been a good one. As events unfolded, the corporation reached a point at which it could have repaid the notes through refinancing, but this does not obliterate the uncontradicted testimony that in 1934 it was impossible to obtain any outside mortgage financing for real estate of this kind except through the device of a purchase money mortgage taken back by the seller.

It is argued that the rate of interest at six per cent per annum was far more than the shareholders could have obtained from other investments. This argument, however, is self-defeating, for it implies that the shareholders would damage their own corporation by an overcharge for interest. There was, moreover, enough objective evidence to neutralize this contention. The outside mortgage obtained at the time the corporation purchased the East Orange property bore interest at the rate of six per cent even though the mortgagee was protected by an equity in excess of forty per cent of the value of the property.[14] In any event, to compare the six per cent interest rate of the notes with other 1934 rates ignores the most salient feature of the notes—their risk. It is difficult to escape the inference that a prudent outside businessman would not have risked his capital in six per cent unsecured demand notes in Fin Hay Realty Co. in 1934. The evidence therefore amply justifies the conclusion of the district court that the form which the parties gave to their transaction did not match its economic reality.

It is argued that even if the advances may be deemed to have been contributions to capital when they were originally made in 1934, a decisive change occurred when the original shareholder, Finlaw, died and his heirs continued to hold the notes without demanding payment. This, it is said could be construed as a decision to reinvest, and if by 1941 the notes were sufficiently secure to be considered bona fide debt, they should now be so treated for tax purposes. Such a conclusion, however, does not inevitably follow. Indeed, the

---

12. See P. M. Finance Corp. v. Commissioner of Internal Revenue, 302 F.2d 786 (3 Cir. 1962); General Alloy Casting Co. v. Commissioner of Internal Revenue, 345 F.2d 794 (3 Cir. 1965), aff'g per curiam 23 CCH T.C.Mem. 887 (1964).

13. See United States v. Henderson, 375 F.2d 36, 40 (5 Cir. 1967).

14. The corporation purchased the property for $175,000 and the sellers took back a purchase money mortgage of $100,000.

weight of the circumstances leads to the opposite conclusion.

First, there is nothing in the record to indicate that the corporation could have readily raised the cash with which to pay off Finlaw's notes on his death in 1941. When Hay, the other shareholder, died in 1949 and his executor two years later requested the retirement of his interest, the corporation in order to carry this out sold one of its properties and refinanced the others. Again, when in 1963 the corporation paid off the notes held by Finlaw's daughters after the Internal Revenue Service had disallowed the interest deductions for 1961 and 1962 it again refinanced its real estate. There is nothing in the record which would sustain a finding that the corporation could have readily undertaken a similar financing in 1941, when Finlaw died even if we assume that the corporation was able to undertake the appropriate refinancing ten years later to liquidate Hay's interest. Moreover, there was no objective evidence to indicate that in 1941 Finlaw's daughters viewed the notes as changed in character or in security, or indeed that they viewed the stock and notes as separate and distinct investments. To indulge in a theoretical conversion of equity contributions into a debt obligation in 1941 when Finlaw died would be to ignore what such a conversion might have entailed. For Finlaw's estate might then have been chargeable with the receipt of dividends at the time the equity was redeemed and converted into a debt. To recognize retrospectively such a change in the character of the obligation would be to assume a conclusion with consequences unfavorable to the parties, which they themselves never acknowledged.

■ The burden was on the taxpayer to prove that the determination by the Internal Revenue Service that the advances represented capital contributions was incorrect.[15] The district court was justified in holding that the taxpayer had not met this burden.

The judgment of the district court will be affirmed.

VAN DUSEN, Circuit Judge (dissenting).

I respectfully dissent on the ground that the "entire evidence," in light of appellate court decisions discussing the often-presented problem of corporate debt versus equity, does not permit the conclusion reached by the District Court.[1]

When the parties holding debt of the taxpayer corporation have a formal debt obligation and it is clear that all parties intended the investment to take the form of debt, a series of considerations such as those mentioned by the District Court should be used to determine whether the form and intent should be disregarded for federal tax purposes. Tomlinson v. 1661 Corporation, 377 F.2d 291 (5th Cir. 1967);[2] J. S. Biritz Con-

---

15. See P. M. Finance Corp. v. Commissioner of Internal Revenue, 302 F.2d 786, 789 (3 Cir. 1962).

1. As to the determination of the trial court that payments were not "interest paid * * * on indebtedness" (26 U.S.C. § 163), this court has stated:
  " * * * it is well-settled that such findings are 'in the nature of an ultimate finding of fact and since such finding is but a legal inference from other facts it is subject to review free of the restraining impact of the so-called "clearly erroneous" rule applicable to ordinary findings of fact by the trial court. * * *'"
  Kaltreider v. Commissioner of Internal Revenue, 255 F.2d 833, 837 (3rd Cir.

1958). Although listed under legal conclusions by the District Court, this determination is similar to the "findings" referred to in *Kaltreider*. See, also, Soles v. Franzblau, 352 F.2d 47, 50 (3rd Cir. 1965). Moreover, regardless of the characterization of the District Court's findings, I am "left with the definite and firm conviction that a mistake has been committed" by the trial court on the record in this case. Diamond Bros. Company v. C. I. R., 322 F.2d 725, 731, n. 9 (3rd Cir. 1963), quoting from United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

2. The panel which decided *Tomlinson* included Senior Circuit Judge Maris of this

struction Co. v. C. I. R., 387 F.2d 451, 455–456 (8th Cir. 1967). As I read the District Court's opinion, the focus was entirely on inferring "the intent of the taxpayer's only two stockholders" at the time the debt was created. To that end, the District Court drew certain inferences which are largely immaterial to the proper decision, and which are clearly erroneous in light of the stipulated facts and uncontroverted evidence.[3]

Whether or not the corporate taxpayer is entitled to an interest deduction turns in this case on the "real nature of the transaction in question" or on whether "the degree of risk may be said to be reasonably equivalent to that which equity capital would bear had an investor, under similar circumstances, made the advances * * *." Diamond Bros. Company v. C. I. R., 322 F.2d 725, 732 (3rd Cir. 1963); Tomlinson v. 1661 Corporation, supra, at 295.[4] When this test is used, the entire history of the corporate taxpayer becomes relevant[5] and a focus solely on the year of incorporation or investment of the debt is not sufficient.

Turning within this framework to the facts, the record does not justify the conclusion that the form of the debt should be disregarded for purposes of federal taxation. The debt was evidenced by written notes,[6] carried 6%

---

court. The corporate taxpayer seeking to deduct interest payments was engaged in the construction, owning and operation of a certain office building, an economic activity quite similar to that of the corporate taxpayer in this case except that construction of real estate arguably increases the "risk" involved in the enterprise. Tomlinson relied heavily on United States v. Snyder Brothers Company, 367 F.2d 980 (5th Cir. 1966), in which the Fifth Circuit adopted with approval the conceptual analysis of Kraft Foods Company v. Commissioner of Internal Revenue, 232 F.2d 118, 123 (2nd Cir. 1956). This carefully reasoned Second Circuit decision suggested that the relevant inquiry for courts seeking to define "indebtedness" under 26 U.S.C. § 163 should turn initially on whether the alleged debt is a "hybrid," partaking of certain characteristics of traditional corporate equity as well as characteristics of debt, or whether the alleged debt is in form entirely debt and intended to be such. See, also, Gloucester Ice & Cold Storage Co. v. C. I. R., 298 F.2d 183, 185 (1st Cir. 1962). It is noteworthy that the Third Circuit case relied on heavily by the District Court, Mullin Building Corporation v. C. I. R., 9 T.C. 350 (1947), aff'd 167 F.2d 1001 (3rd Cir. 1948), is a case of a "hybrid" investment which, although the corporate taxpayer was formed solely to hold real estate, was named "debenture preferred stock" and demanded corporate liquidation before the "debenture preferred stock" principal could be returned. Similarly, Messenger Publishing Co. v. C. I. R., P.H.Memo, T.C., ¶ 41.241, aff'd 168 F.2d 903 (3rd Cir. 1948), involved a hybrid named "preferred stock."

3. To the extent that the District Court proceeded under a misconception as to the relevant legal test, this court is not bound by the "clearly erroneous" rule of F.R.Civ.P. 52. See C. I. R. v. Danielson, 378 F.2d 771, 774 (3rd Cir. 1967). See, also, United States v. United Steelworkers of America, 271 F.2d 676, 685 (3rd Cir.), aff'd 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959); and Kraft Foods Company v. Commissioner of Internal Revenue, supra, 232 F.2d at 122: " * * * where, as here, the evidence consisted of stipulated facts, this Court is entitled to draw its own inferences of ultimate fact from the record."

4. Charter Wire, Inc. v. United States, 309 F.2d 878, 880 (7th Cir. 1962), cited by the District Court as a source of the relevant criteria, also suggests that the test is whether "the totality of facts indicates a risk-capital investment." The corporate taxpayer in the *Charter Wire* case, however, was involved in manufacturing, not real estate; the debt, 100 times the size of equity, was subordinated to other unsecured debt of general creditors; and a new shareholder was forced to buy debt in proportion to his new stock at a time when no additional financing was needed.

5. See, e. g., Wilbur Security Company v. C. I. R., 279 F.2d 657, 662 (9th Cir. 1960).

6. See, e. g., Diamond Bros. Company v. C. I. R., supra, where the only evidence of debts was book entries; Wilbur Security Company v. C. I. R., supra, where the first written evidence of debt was

interest which was paid every year,[7] and was not subordinated in any way to similar debt of general creditors.[8] It was carried on the corporate books and tax returns as debt,[9] being payable on demand, it was always listed as a debt maturing in less than one year,[10] and on Mr. Finlaw's estate tax return was listed as promissory notes payable on demand.[11] The parties clearly intended the advances as debt and unfailingly treated them as such. The only testimony on the usual capitalization of real estate companies in the Newark area was that:

> "The usual capitalization is a thousand dollar investment in capital and then the rest of the monies are loaned either * * * by individuals or stockholders of the corporation to the

corporation, which in turn the individuals lending the money expect a return for their loans.

\* \* \* \* \* \*

> "[Of the real estate corporations that] I have dealt with, at least ninety-five per cent and more have had a thousand capitalization and, of course, loans from the various lenders would depend upon the size of the transaction, monies that were required."

On this record, Conclusions of Law 3–8 as worded are not justified. The District Court placed heavy reliance on the fact that the stockholder's debt was in the same proportion as their equity holdings. This fact, without more, is not controlling since there is no doubt that investors can have a dual status.[12]

---

28 years after investment; Montclair v. C. I. R., 318 F.2d 38 (5th Cir. 1963).

7. See, e. g., Tomlinson v. 1661 Corporation, supra, where the debt was upheld even with a provision for accruing and accumulating interest when not paid; Montclair v. C. I. R., supra, where no fixed interest was given and the debt was disallowed; United States v. Henderson, 375 F.2d 36 (5th Cir. 1967), no interest paid; Diamond Bros. Company v. C. I. R., supra, no interest paid.

8. See, e. g., P. M. Finance Corporation v. C. I. R., 302 F.2d 786 (3rd Cir. 1962), agreement prevented any payment on loans until bank loans paid off in full—loans could not be paid off while corporation continued in bar and cocktail lounge financing business; Gooding Amusement Co. v. C. I. R., 236 F.2d 159 (6th Cir. 1966), subordination to general creditors; United States v. Snyder Brothers Company, supra; McSorley's Inc. v. United States, 323 F.2d 900 (9th Cir. 1963); subordinated by agreement to all debt, existing or not, secured or not; Charter Wire, Inc. v. United States, supra, subordinate to later bank loan.

9. See, e. g., "hybrid" cases such as John Wanamaker Philadelphia v. Com'r of Int. Revenue, 139 F.2d 644 (3rd Cir. 1943; Mullin Building Corporation v. C. I. R., supra; Pierce Estates v. Commissioner of Internal Revenue, 195 F.2d 475 (3rd Cir. 1952), where the instruments had names that indicated equity

attributes and were carried as capital entries.

10. Apparently the District Court regarded demand notes as having no fixed maturity, see Conclusion of Law 4. This seems incorrect since demand paper means that the debt is "mature" at the holder's option. The better characterization would seem to be that demand notes held by someone with a voice in management are a type of long-term investment. See, e. g., Taft v. C. I. R., 314 F.2d 620 (9th Cir. 1963).

11. This consistent treatment does not, of course, estop either the Commissioner or the taxpayer any more than the decision in this case controls the tax status of repaid principal on these loans in the hands of the remaining Fin Hay shareholders. The Government may well have sought to challenge these corporate interest deductions before challenging the individuals' returns as a matter of tactics, but this, and the question of the tax consequences of the liquidation of the remaining loans in 1962–1963, should not influence the decision in the present case, see Budd Company v. United States, 252 F.2d 456, 458 (3rd Cir. 1957).

12. See, e. g., Farley Realty Corporation v. C. I. R., 279 F.2d 701, 704 (2nd Cir. 1960); Wilshire & West Sandwiches v. Commissioner of Int. R., 175 F.2d 718, 720 (9th Cir. 1949). As noted in P. M. Finance Corporation v. C. I. R., supra, at 789, control of the corporation re-

The inferences that "more" was involved in this case are not justified by this record. The fact that the loans were used to begin the corporate life and buy the income-producing assets must be placed in proper perspective. Without any basis in the record, the District Court assumed that the loans were advanced to prevent a sudden corporate deficit that was created by the Wainwright Street property investment's unexpectedly requiring more funds than the corporation had. Real estate cases, however, and uncontroverted testimony in this case show that corporations owning and operating buildings frequently and traditionally borrow the substantial part of money needed to secure their principal assets and that this was contemplated by a corporate resolution passed in the month of organization at the original directors' meeting.[13] Cases denying the validity of debt because it is contemporaneously advanced with the start of corporate life generally involve other industries [14] or a partnership becoming a corporation.[15]

The loans were denied debt status because there was no intent to seek repayment within a "reasonable time," because the corporation had no retirement provision (or fund) for the principal and because the debt had no maturity date (Conclusions 3 and 4). To the contrary, demand notes have a maturity date at the discretion of the holder (or of his transferee when the notes are freely negotiable, as were the Fin Hay notes). And failure to transfer the notes or demand payment is irrelevant when, as here, the evidence shows that the 6% rate made the debt a good investment.[16] In addition, when a corporation holds appreciating real estate and contemplates recourse to refinancing, the lack of a sinking fund assumes little, if any, significance.[17] There was no evidence and no discussion of what constitutes a "reasonable time" for refraining from making a demand on such a promissory note.

The loans were also found to be equity because redemption was expected only out of future earnings or surplus and because they were unsecured and subordinate to prior secured loans (Conclusions 6 and 8). To the contrary, the evidence shows that the parties contemplated redemption out of "refinancing" as well if a demand were made when surplus was deficient; and this in fact was what happened in 1951 and 1962—

quires the courts to examine the shareholder-creditor relationship with great care but "the decisions [footnote omitted] in most instances have required some further indication that sole or pro-rata shareholder 'debt' is in reality equity rather than indebtedness."

13. See, e. g., Tomlinson v. 1661 Corporation, supra; Mullin Building Corporation v. C. I. R., supra; Farley Realty Corporation v. C. I. R., supra; McSorley's Inc. v. United States, supra.

14. See, e. g., United States v. Henderson, supra, relied upon by the majority, involving an iron castings foundry.

15. See, e. g., United States v. Snyder Brothers Company, supra; Gooding Amusement Co. v. C. I. R., supra.

16. See, e. g., Tomlinson v. 1661 Corporation, supra, at 297. Uncontroverted testimony of one creditor-stockholder showed that he regarded the 6% return as a good investment (it is noted that interest was always paid on time) and nothing on the record or in any other cases showing interest rates in 1934 or later indicates that a 6% return on an unsecured demand note was unreasonably low when issued in 1934 or subsequently anything other than the good investment alleged. Many corporations are forced to continue with initial financing at higher rates (such as the 6% here) and an interest rate that fluctuated with the "going rate" would be an additional indication against the bona fides of this debt. See, e. g., Montclair Inc. v. C. I. R., supra, at 40. The Fin Hay notes were freely transferable, unlike the situation, for instance, in Mullin Building Corporation v. C. I. R., supra, and such transferability is additional argument for allowing debt status under § 163.

17. See J. S. Biritz Construction Co. v. C. I. R., supra, at 457.

1963.[18] Corporate debt does not become equity because it is contemplated that principal will be retired by refinancing. In addition, a review of the "subordination" cases shows that there was no "subordination" in this case as that term is used in other cases where the challenged debt was subordinated to all other debt of similar type or otherwise subordinated by agreement.[19]

The District Court also placed emphasis on the fact that at the end of 1935 the shareholders' salaries were accrued but unpaid in the amount of $2400 and that in 1938 through 1940 the shareholders advanced an additional $6000 as loans. The corporate tax returns and books, however, show that the salaries could have been paid at the end of 1935 from $4,340.21 in cash on deposit,[20] and that during the period of the additional loans of $6000 the shareholders received $6800 in dividends from the corporation.[21] These additional facts, unexplained by the District Court, negate the implication that Fin Hay Realty Company was in serious financial trouble at the outset of its existence, at least to any such degree that all the challenged loans were made "at a risk" similar to that of venture capital.[22] It is noted, in addition, that by 1938, when the original purchase money mortgage was re-financed, $18,000 of principal had been paid.

Although appellate decisions on the debt-equity problem constantly reiterate the maxim that each instance of defini-

---

18. The Hay interests were bought out entirely in 1951, apparently after arm's-length dealing with his executor. After study of the tax returns and corporate books introduced as exhibits, the cash events of 1951 seem to be as follows (figures rounded off):

|   |   |   |   |
|---|---|---|---|
| A. | Refinance, new mortgage of | | $124,000. |
| B. | Pay Hay notes | | 53,000. |
| | Balance | | $ 71,000. |
| C. | Sell Wainwright Street | | 79,000. |
| | Balance | | $150,000. |
| D. | Expenses—cost of sale | $ 3,000. | |
| | Capital Gains tax | 10,000. | |
| | Pay off old mortgage | 40,000. | 53,000. |
| | Balance | | $ 97,000. |
| E. | Redeem Hay stock | | 77,000. |
| | Balance | | $ 20,000. |

The 1952 return lists the $20,000 as invested in "S. & L. Assn." As can be seen, even though the sale proceeds were used to pay off the old mortgage, more than enough money was available from the refinancing to pay off the notes and the mortgage. Similarly, the 1963 re-mortgaging gave net mortgage proceeds of approximately $210,000 for paying $47,000 of the remaining $53,000 in notes ($6,000 was apparently paid for out of earnings).

---

19. See cases in footnote 8, supra. The majority also seems to agree with this reading of the cases, see their footnote 12.

20. Even with the subsequent payment of these salaries, the 1936 salaries of $4000 and a $1600 dividend for 1936, the 1936 year-end cash balance improved to $5,-657.13. It does not appear that the corporation had to maintain such large cash balances; subsequent tax returns show several lower year-end totals: 1937—$158.29; 1939—$536.98; 1940—$2,532.-93.

21. Thus the stockholders received $800 more than they loaned during the period 1938–1940. These dividends were paid continuously from 1936 through 1952, a total of $26,000.00.

22. See, for instance, the factors of "risk" noted in Gilbert v. C. I. R., 262 F.2d 512, 514 (2nd Cir. 1959).

tion turns on the particular facts of each case, a reading of many of these cases, including all those cited above, indicates two rather distinct conclusions concerning the assessment of the severity of the "risk" attached to alleged debt transactions. First, when the problem of definition arises under 26 U.S.C. §§ 165, 166 (worthless stock, bad debt), the risk of failure has already been realized and the party seeking to minimize the degree of such risk must show more "factors" than otherwise clearly argue for a debt classification. Secondly, regardless of the end purpose for defining indebtedness, fewer factors need be present (such as subordination, no interest, etc.) to allow a conclusion of "equity" when, as a matter of common knowledge, the economic enterprise has a higher chance of commercial failure. Consequently, few cases (and particularly few where taxpayers holding formal debt lose) deny debt status or even raise the question where the enterprise risk, as in this case, involves the mere holding and operation of real estate. As the risks increase, involving in addition construction of the real estate, or non-real estate operations subject to more immediate risk-creating problems of marketing, labor, advertisement, supplies, etc., the frequency of cases challenging debt and of decisions finding equity increase. The uncontradicted testimony (without finding of lack of credibility) of the universal practice in the Newark area in conformity to the course followed by taxpayer (p. 696, supra) is entitled to consideration. Also, the subsequent successful history of this corporate taxpayer cannot be disregarded and militates strongly against denying an interest deduction on this record. The Fin Hay Realty Co. did not go bankrupt, was not unable to refinance or extend its pur-

chase money mortgage due in 1939, and has never failed to meet a demanded purchase of the notes.

On this record, these loans were bona fide loans, "at risk" in this enterprise in no different way than any debt investment is "at risk" for a general creditor [23] of a real estate holding and operating corporation. The District Court pointedly took judicial notice, both of the bargain real estate purchases possible in 1934 and of the steadily rising real estate values in Essex County, New Jersey.[24] Subsequent refinancings by the taxpayer, as well as the entire course of its history, demonstrate that this investment in this particular venture was not a "risk capital" investment of the type that should compel disregarding the clear intent of the parties and form of the transaction. Two recent "real estate" decisions (involving, moreover, construction as well as holding of real estate) suggest the proper result for the present case. As stated in Tomlinson v. 1661 Corporation, supra, at 300:

> "We cannot, by manipulation of tax law, preclude the parties from exercising sound business judgment in obtaining needed investment funds at the most favorable rate possible, whether it be a commercial loan, or, more likely and as is the case here, a loan from private interested sources with sufficient faith in the success of the venture and their ultimate repayment to delete or minimize the 'risk factor' in their rate of return."

Similarly, in J. S. Biritz Construction Co. v. C. I. R., supra, at 459, the court said:

> "There is actually no evidence that this was not a loan, was not intended to be a loan, or that Biritz actually in-

---

23. The interest paid reflects to a certain extent the risk involved, Tomlinson v. 1661 Corporation, supra, at 300, and the 6% rate does not appear to be sufficiently low to suggest that in this case a substantial amount of risk was unreflected in the interest rate and, hence, the notes must be equity investment.

24. And see the court's observations on real estate transactions, entrepreneurs wishing to limit equity investment, and payment out of earnings in J. S. Biritz Construction Co. v. C. I. R., supra, at 459.

tended to make a capital investment rather than a loan.

"We think the Tax Court has painted with too broad a brush in limiting the permissible activities of an entrepreneur in personally financing his business. Financing embraces both equity and debt transactions and we do not think the courts should enunciate a rule of law that a sole stockholder may not loan money or transfer assets to a corporation in a loan transaction. If this is to be the law, Congress should so declare it. We feel the controlling principle should be that any transaction which is intrinsically clear upon its face should be accorded its legal due unless the transaction is a mere sham or subterfuge set up solely or principally for tax-avoidance purposes."

I would reverse and enter judgment for the corporate taxpayer.