## WARREN S. and GLORIA R. NEWMAN, Petitioners

### v.

## LEROY A. QUINN, DIRECTOR OF BUREAU OF INTERNAL REVENUE, GOVERNMENT OF THE VIRGIN ISLANDS, Respondent

Civil No. 1981-214

District Court of the Virgin Islands

Div. of St. Croix

February 14, 1983

Todd H. Newman, Esq., Christiansted, St. Croix, V.I., *for petitioners*

Thomas G. Smiley, Esq., Assistant Attorney General (Tax) (Department of Law), St. Thomas, V.I., *for respondent*

O'BRIEN, *Judge*

## MEMORANDUM OPINION

Petitioners filed a joint income tax return for the calendar year 1976 with the Commissioner of Finance, now known as the Director of the V.I. Bureau of Internal Revenue. On their 1976 income tax return, petitioners claimed business bad debt losses from monetary advances to Tropical Motors Corporation totaling over $110,000. A timely statutory notice was sent to petitioners notifying them of an income deficiency based in part on disallowance of the aforesaid business bad debt loss deduction. Petitioners timely filed a redetermination of this alleged deficiency, pursuant to 33 V.I.C. § 943 and the case was tried before this Court without a jury on November 18, 1982.

The Court is called on in this case to decide whether certain advances made by petitioner Warren S. Newman ("Newman") to Tropical Motors Corporation, a corporation largely owned by him, should be classified as loans or as contributions to capital under the Internal Revenue Code.[1] Since the corporation became defunct and

---

[1] Virgin Islands income tax law is identical to the U.S. Internal Revenue Code as applicable to the Virgin Islands 48 U.S.C. § 1397. See also 33 V.I.C. § 1931(15) (1967); Dudley v. Commissioner of Internal Revenue, 3 V.I. 685, 258 F.2d 182 (3d Cir. 1958).

the money was never repaid, Newman would be entitled to deduct the lost advances against income if the transactions are treated as loans. If they are contributions to capital, they are deductible only as capital losses to offset capital gains, if any. The Court finds that some of the advances are loans, and others are contributions to capital, all for the reasons cited herein.

## I. FACTS

In March 1971, Newman became the controlling shareholder of Tropical Motors Corporation ("TMC"), an automobile dealership. That transaction, while it did not involve an immediate cash outlay by Newman, consisted of Newman guarantying certain loans for the corporation. It was through his efforts that an extension of a line of credit from a bank was acquired for TMC. At the time of Newman's takeover, TMC had more liabilities, which included outstanding loans, than assets. The principal of the loan which Newman first guarantied was reduced by agreement to an amount sufficient to balance the assets and liabilities. Newman concedes that, under this arrangement, with assets and liabilities equally balanced, there was no shareholder's equity in the corporation.

Here is the profit picture of the corporation at the end of the corporation's fiscal year, August 31, for the years that Newman controlled it:

| Aug. 31, 1971 | $ 27,544 | profit |
| Aug. 31, 1972 | 47,023 | profit |
| Aug. 31, 1973 | 67,531 | profit |
| Aug. 31, 1974 | (143,833) | loss |
| Aug. 31, 1975 | (62,970) | loss |

While the picture for the fiscal year ending August 31, 1973, appears to reflect the largest profit of the first three years of the company while under Newman's control, a closer analysis of the corporation's financial position demonstrates that it was headed for trouble, a position which will be later described in this opinion.

## A. NEWMAN'S ADVANCES TO TMC

After Newman acquired the shares of TMC in March 1971 with no cash investment, he made a series of advances to TMC. The following is a table indicating each of the notes he claims was issued for the advances, the dates issued, the due date, and the interest each note should have earned from the date of issuance to the end of 1975:

## Table No. 1

### NOTES AND INTEREST EARNED

| Amount | Date | Due | 1971 | 1972 | 1973 | 1974 | 1975 | Total |
|---|---|---|---|---|---|---|---|---|
| 20,000 | 8/71 | 10/74 | $533.32 | $1599.96 | $1599.96 | $1599.96 | $1599.96 | $6933.16 |
| 35,000 | 4/73 | 10/74 | | | 1866.64 | 2799.96 | 2799.96 | 7466.56 |
| 20,000 | 10/73 | Demand | | | 266.66 | 1599.96 | 1599.96 | 3466.58 |
| 20,000 | 8/74 | 10/75 | | | | 733.32 | 2199.96 | 2933.28 |
| 3,000 | 1/75 | 10/75 | | | | | 240.00 | 240.00 |
| 13,516 | 8/75 | Demand | | | | | 360.40 | 360.40 |
| | | | $533.32 | $1599.96 | $3733.26 | $6733.20 | $8800.24 | $21399.98 |

None of these notes were ever paid. As each fell due it was not paid, and there is no convincing evidence that there was any formal extension of the due date of any of them. Some of them were due and outstanding when subsequent advances were made. There was also a $5,000 one year note issued in January 1973, which was not paid until August 1975, about 20 months after it became due. This note, since it was ultimately paid, is not listed in the above table. These notes that were issued but never paid should have earned Newman $21,399.98 in interest from their respective dates of issuance through the end of 1975.[2]

Newman's tax returns for the same period give us the picture of what interest *actually* was paid on these notes. Here is what the tax returns show:

### Table No. 2

### INTEREST ACTUALLY PAID ON NOTES

| Year | Amount |
|---|---|
| 1971 | $—0— |
| 1972 | 2,089 |
| 1973 | Unknown* |
| 1974 | 6,800 |
| 1975 | 2,150 |
| 1976 | —0— |

\* No breakdown of the $12,023 in total interest received shown on Newman's return.

This amount would include any interest paid on the $5,000 note that actually was paid off. It can reasonably be seen that the notes, although no principal was being paid, were nearly current as to

[2] The figures in Table No. 1 may differ from the actual figures in terms of pennies, depending on how interest was calculated.

462

interest through the end of 1974. No interest of any kind was paid in 1975, although $8,800.24 was due to be paid. See Table No. 1.

## B. TMC'S ONGOING FINANCIAL CONDITION

When Newman acquired TMC's shares of stock, as stated earlier, he did not put up any cash. As of March 1, 1971, the date he took over the business, there was $81,610 cash on hand. Six months later, by the end of that fiscal year, August 31, 1971, the cash on hand had dropped to $52,939, to which Newman had already advanced $20,000.

Never again was the corporation to have as much cash on hand for day-to-day operations as it had had on the day Newman took over the business. The following table demonstrates a comparison of the cash on hand for operating expenses against the advances made by Newman:

### Table No. 3

#### Comparison—CASH ON HAND TO ADVANCES MADE

| As of | 2/28/71 | $81,610 | |
|---|---|---|---|
| | 8/31/71 | 52,939 | ($20,000 advanced by Newman) |
| | 8/31/72 | 79,647 | (No advances during fiscal year by Newman) |
| | 8/31/73 | 60,530 | ($35,000 advanced by Newman; $55,000 now owed to Newman) |
| | 8/31/74 | 54,183 | ($40,000 advanced by Newman; $95,000 now owed to Newman) |
| | 8/31/75 | 51,817 | ($16,516 advanced by Newman; $111,516 now owed to Newman) |

By August 31, 1973, as the table indicates, TMC had $60,530 cash on hand and owed Newman $55,000. During the fiscal year ending August 31, 1974, Newman advanced another $40,000, making a total of advances of $95,000. The corporation, however, ended that fiscal year with only $54,183 cash. Thus, after August 31, 1973, the corporation would never have been able to simply pay off Newman out of the cash on hand.

The corporation was always suffering from liquidity problems, but this became especially severe during the fiscal year ending August 31, 1973, for a variety of reasons. On paper, the corporation ended that fiscal year with a profit of $67,531, its best performance under Newman's ownership. But as stated earlier, danger signals emerged during that fiscal year, and those danger signals can be linked, at least in part, to a vast increase in the inventory of unsold new cars which sapped the corporation of its financial strength beginning in late 1972. The following table shows that the year-end

463

inventory as of August 31, 1973, had increased from $621,555 to $1,002,095, a huge increase in unsold new cars.

The table below demonstrates also that from August 31, 1972, to August 31, 1975, the cost of goods as a percentage of the dollar amount of goods sold increased in every year. This meant, of course, that the corporation was faced with an ominous profit pinch. At the same time, the net profit as a percentage of total sales remained negligible and did not increase as sales increased.

### Table No. 4

|  | Cost of Merchandise Bought During Year | Inventory at End of Year | Cost of Goods as % of Goods Sold* | Net Profit as % of Sales |
|---|---|---|---|---|
| 8/31/72 | $1,942,776 | $ 621,555 | 73% | 1.6% |
| 8/31/73 | 3,144,253 | 1,002,095 | 75% | 1.8% |
| 8/31/74 | 2,448,680 | 912,641 | 78% | No Profit |
| 8/31/75 | 904,783 | 670,051 | 82% | No Profit |

*When Newman took over in March 1971, TMC's Cost of Goods were 70% of Sales.

The next table makes the same point in a different manner. The Court considers quick assets (cash on hand and receivables), compared to the current liabilities (due in one year or less) as a good indication of the financial health of a corporation. Table No. 5 indicates that under Newman's ownership, TMC improved its ratio of quick assets to current liabilities in the fiscal years ending August 31, 1971, and August 31, 1972. However, during the fiscal year ending August 31, 1973, the quick assets increased by only $51,000 while the current liabilities increased by more than $400,000. All of this points once again to the period September 1, 1972, through August 31, 1973, as a decisive and disastrous year for TMC notwithstanding the fact that it made its largest profit ever under Newman. The ratio for the next year ending August 31, 1974, was worse. It was during this period that Newman advanced more money to TMC than any other year.

### Table No. 5

#### Comparison—QUICK ASSETS TO CURRENT LIABILITIES

|  | Quick Assets | Current Liabilities |
|---|---|---|
| 8/31/71 | $126,512 | $639,789 |
| 8/31/72 | 164,874 | 546,132 |
| 8/31/73 | 225,096 | 959,701 |

464

| | Quick Assets | Current Liabilities |
| --- | --- | --- |
| 8/31/74 | 176,977 | 950,739 |
| 8/31/75 | 137,386 | 566,274 |

Newman made one last attempt to shore up TMC, in early 1975. He advanced $3,000 to the corporation in January 1975, and then, in April, put together a renewed package of secured loans with Chase Manhattan Bank. He paid a stiff price, however, because (1) he was forced to personally guaranty up to $50,000 of the Chase loan, and (2) he was required to execute a subordination agreement placing his unsecured $95,000 (at that time) in advances behind all of the Chase borrowings, leaving him further exposed. For Chase, there was little or no risk, since the new car inventory, combined with Newman's guaranty, covered its loan to TMC in acceptable fashion. Newman had no security for his advances.

The state of the corporation during that time can be seen not only in Newman's maneuvers, but in a resolution adopted in April 1975 by the board of directors of the corporation. Once again, Newman was forced to forego payment, this time, of his consulting fees. This was done, according to the resolution, "in view of the financial position of the corporation". The suspended consulting fees were never paid, but rather, later that year, were converted into a further advance by Newman of $13,516, bringing the ultimate total to $111,516.

The corporation never recovered. It was forced into bankruptcy in 1976, was liquidated, and Newman was not only never paid back, he was required to advance the guaranty to Chase bank up to $50,000.

## II. APPLICABLE LAW

At the trial on this matter, the Court ruled that if the amounts described herein were "loans", they would be deductible as business bad debts under the Internal Revenue Code, 26 U.S.C. § 166(a), and not as nonbusiness bad debts under § 166(d). The essential question the Court must now determine is whether the advances made by Newman to TMC qualify as a loss under 26 U.S.C. § 165(a) and (c) or whether the advances are contributions to capital and thus deductible only as a loss of a capital asset against capital gains under § 165(g).

The burden of proving that these advances were bona fide loans rests on the taxpayer. Although petitioners presented testimony which was not contradicted by witnesses offered by the

government, this does not mean that the petitioners are entitled to a finding in their favor. It is the duty of this Court to determine, as trier of the facts, the credibility of the witnesses, to weigh the evidence, draw inferences from undisputed facts or facts it finds to exist, and choose between conflicting inferences in reaching its ultimate holding. Diamond Bros. Company v. Comm. of Internal Revenue, 322 F.2d 725, 730 (3d Cir. 1963) (cases cited therein are omitted).

## III. DISCUSSION

Any analysis to determine whether an advance is a "loan" or "contribution to capital" must necessarily begin with the criteria outlined in Fin Hay Realty Co. v. United States, 398 F.2d 694, 696–697 (3d Cir. 1968) as reinforced by Scriptomatic, Inc. v. United States, 555 F.2d 364, 367 (3d Cir. 1977). Those sixteen criteria will not be repeated verbatim in this opinion, since counsel have referred to them repeatedly. Suffice it to say that those criteria which apply in the instant case include: (1) the intent of the parties; (2) the identity between creditor and shareholders; (3) extent of participation in management by the holder of the instruments; (4) the "thinness" of the capital structure in relation to debt; (5) the risk involved; (6) the relative position of the instrument holder in relation to other creditors; (7) the presence or absence of a fixed maturity date; (8) the timing of the advance with reference to the organization of the corporation.

Fin Hay, supra, stresses that neither any single criterion nor any series of criteria can provide a conclusive answer to the varying circumstances of each case. To that end the Court stated:

> The various factors which have been identified in the cases are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship. Since there is often an element of risk in a loan, just as there is an element of risk in an equity interest, the conflicting elements do not end at a clear line in all cases .... Where the corporation is closely held, however, and the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull. This is particularly so where a shareholder can have the funds he advances to a corporation treated as corporate obligations

466

instead of contributions to capital without affecting his proportionate equity interest. Labels, which are perhaps the best expression of the subjective intention of parties to a transaction, thus lose their meaningfulness.

To seek economic reality in objective terms of course disregards the personal interest which a shareholder may have in the welfare of the corporation in which he is a dominant force. But an objective standard is one imposed by the very fact of his dominant position and is much fairer than one which would presumptively construe all such transactions against the shareholder's interest. Under an objective test of economic reality it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only.

Fin Hay, supra, 398 F.2d at 697 (footnote omitted).

Viewed from the Fin Hay perspective, the Court finds that the first two advances from Newman to TMC, i.e., the $20,000 of August 1971 and the $35,000 of April 1973 can, from the evidence, be categorized as loans. All subsequent advances, however, estimated at $56,516, must be considered as contributions to capital.

## A. THE FIRST TWO ADVANCES

The government argues that since Newman received the stock of TMC in March 1971 with no cash outlay of any kind, and since, at best, the assets and liabilities were in a state of fragile balance, the corporation was undercapitalized from the start of Newman's tenure as owner. The government then suggests that all advances flowed from that undercapitalization and should be treated as contributions to capital. At first blush the government appears to be correct, but an analysis of the corporate financial position in March 1971 demonstrates that while Newman did not bring immediate cash to the corporation, he did bring several other important elements.

An exhibit offered by the petitioners gives an idea of the elements brought to the deal by Newman at the time of purchase. It is actually a document prepared by the government for internal use in this case, and it conceded that when Newman bought the TMC shares of stock, he also gave his personal guaranty and made arrangements with Chase Manhattan Bank for an extension of credit. Exhibit No.

51. This arrangement gave the corporation some operating room, especially since at the time of takeover, the cash on hand was $81,610, the highest it was ever to be. And, the cost of goods as a percentage of the sales price of those goods was only 70% on March 1, 1971, when he became the owner of TMC. This was the lowest percentage of any year under Newman's aegis, which is another way of saying that the profit margin of TMC at takeover was the best it was ever to be, since the cost of goods sold increased as the percentage of the selling price increased as well. See Table No. 4.

Nonetheless, it is easy to understand that when Newman made a $20,000 advance to the corporation in August 1971, he did so with the intent that it be a temporary matter, a loan, to carry the corporation through the introduction of the new models and to gear up for a strong sales effort. That note, although never introduced into evidence, bore a specific interest rate and a due date, according to the uncontradicted testimony. Viewed in terms of the economic reality at the time of the first advance, the Court finds that it was the intent of Newman and the corporation that this transaction be a loan, and that the corporate financial position was not such as to hinder considering it in that vein.

The same finding holds true for the $35,000 advanced in April 1973. The evidence is not as strongly in favor of treating this advance as a loan, but it meets the preponderance of the evidence test. There were still about five months of the fiscal year remaining, the corporation was showing a profit, and it had increased its purchases of new cars. At that time, the corporation probably had not foreseen that it would end that fiscal year with the largest inventory of unsold vehicles in its history. The timing of the $35,000, coming as it did in the middle of the third consecutive profitable year, suggests that Newman and the corporation still intended that this be a short-term loan, despite the fact that the original $20,000 had not yet been repaid.

██ Up to and including the $35,000 loan, the Court finds that the two transactions between Newman and TMC could have taken place even if Newman were an outside lender, since there was cash on hand to meet the debt, and the corporation could have written a check to pay off the loan, even though this would have left the corporation severely strapped financially. Under the totality of the circumstances existing, therefore, the $55,000 advanced through April 1973 will be treated as loans.

## B. THE REMAINDER OF THE ADVANCES

From October 1973 through 1975, Newman made additional advances totaling $56,516. As shown on Table No. 1, they were $20,000 in October 1973; $20,000 in August 1974; $3,000 in January 1975 and $13,516 in August 1975. By the time of the October 1973 advance, however, both TMC and Newman had a better picture of the corporation's diminishing fiscal health. The fiscal year ending August 31, 1973, had ended with more than $1,000,000 worth of new cars unsold, and with costs rising as a percentage of total sales. Thus, there was a squeeze on profits, cash on hand was down nearly $20,000 from the prior fiscal year, and current liabilities had dramatically increased.

The very future of the corporation was now open to question. The time span between advances narrowed to a period of months, in contrast to the first two loans which were more than two and one half years apart. Strong attempts to sell off the inventory of new cars were not successful: the inventory was nearly as large on August 31, 1973, as a year earlier. See Table No. 4.

Petitioners cite the newly arranged 1975 loan with Chase Manhattan Bank as evidence of the corporation's strong financial position. This is not convincing, since the terms of the loan protected Chase Manhattan Bank at the expense of all other creditors, especially Newman, who was required to subordinate his advances entirely to the Chase transaction. This situation did not come on like a bolt of lightning. It was a developing dilemma readily obvious by an analysis of the corporation's financial records. The seeds of financial deterioration were planted as far back as the fiscal year which began September 1, 1972.

The corporation's board of directors recognized as much. The minutes suspending payments to Newman are dated April 1975, the same month as the Chase borrowings, and the minutes speak of the difficult financial state of the corporation. The Chase borrowing was a last, desperate attempt to refinance the elephantine inventory.

The advances made by Newman during that period were aimed at "plugging the dike". No arms length lender, knowing the state of the corporation's financial health, would make unsecured loans to TMC in October 1973 and thereafter. There is no proof in the record that Newman's advances were ever secured, although there is a suggestion in the minutes in 1975 that they would be secured against assets not pledged to Chase Manhattan Bank.

Coupled with the failure to pay the earlier loans, is the fact that

Newman's advances raised the corporation's obligation to him above the cash reserves of the corporation itself. TMC's cash position was getting lower and lower, at the same time its obligation to Newman was getting higher and higher. This is not a situation which would be welcome to an arms length lender.

■ All advances after April 1973 will, therefore, be treated as contributions to capital.

## IV. CONCLUSION OF LAW

The Court makes the following conclusions of law:

(1) Advances made by Newman to TMC in August 1971 and April 1973, respectively, totaling $55,000, will be considered as loans, and the fact that they were never repaid will permit Newman to treat them as business bad debts in accordance with 26 U.S.C. § 166(a).

(2) Advances made by Newman in October 1973 and thereafter, totaling $56,516, will be considered as contributions to capital of TMC, and the fact that such contributions became worthless will permit their treatment under 26 U.S.C. § 165(g).

(3) The government shall recalculate the deficiency in taxes, if any, of Newman, and submit such recalculation, initialed by petitioners in the form of a proposed judgment, to the Court, within thirty (30) days of this date.